**GREAT ATLANTIC & PACIFIC TEA CO.
v. FEDERAL TRADE COMMISSION.**

No. 6734.

Circuit Court of Appeals, Third Circuit.

Sept. 22, 1939.

Caruthers Ewing, of New York City (Watson, King & Brode and Feldman & Kittelle, all of Washington, D. C., of counsel), for petitioner.

Joseph J. Smith, Jr., of Washington, D. C., W. T. Kelley, Chief Counsel, Federal Trade Commission, and Joseph J. Smith, Jr., Wilbur N. Baughman, and John Darsey, all of Washington, D. C., Sp. Attys., for respondent.

Before BIGGS and MARIS, Circuit Judges, and KALODNER, District Judge.

BIGGS, Circuit Judge.

The petitioner, The Great Atlantic & Pacific Tea Company, seeks to have this court set aside an order of the Federal Trade Commission entered on January 25, 1938, requiring the petitioner to cease and desist from certain alleged violations of Section 2(c) of the Clayton Act, as amended by the Robinson-Patman Act, Act of June 19, 1936, c. 592, 49 Stat. 1526, 15 U.S.C.A. § 13(c). The order referred to is set out as an appendix to this opinion.

The petitioner relies on three assignments of error. These are as follows: (1) That the Commission erred in finding that "No brokerage or selling services whatsoever, or any other form of services in connection with the purchase of supplies by, or the sale thereof to, the Respondent are intended to be or are rendered to sellers by the Respondent or by any agents or employees of the Respondent"; (2) that the Commission erred as a matter of law in holding that the petitioner is not entitled to an allowance or discount reflecting alleged savings to sellers of brokerage or services in lieu of brokerage; and (3) that the Commission erred in finding " * * * that the acceptance of discounts in lieu of brokerage by the Respondent tends to injure competition between the Respondent and its competitors, and does injure competition between sellers who grant such discounts and allowances to the Respondent and those who do not".

█ Since questions of fact as well as law are presented for our consideration, we will deal first with the facts. There is no doubt, as this court stated in Federal Trade Commission v. Artloom Corporation, 3 Cir., 69 F.2d 36, 37, 38, that "The fact findings of the Commission, if supported by testimony, shall be conclusive." See Federal Trade Commission v. Algoma Lumber Company, 291 U.S. 67, 73, 54 S.Ct. 315, 78 L.Ed. 655; Federal Trade Commission v. Standard Education Society, 302 U.S. 112, 117, 58 S.Ct. 113, 82 L.Ed. 141; and Minter v. Federal Trade Commission, 3 Cir., 102 F.2d 69, 70. It is also the law that the " * * * weight to be given to the facts and circumstances admitted as well as the inferences reasonably to be drawn" from such facts and circumstances are for the Commission, Federal Trade Commission v. Pacific States Paper Trade Association, 273 U.S. 52, 63, 47 S.Ct. 255, 258, 71 L.Ed. 534, and that courts will not " * * * pick and choose bits of evidence to make findings of fact contrary to the findings of the Commission," Federal Trade Commission v. Standard Education Society, supra, 302 U.S. at page 117, 58 S.Ct. at page 116, 82 L.Ed. 141. The duty of this court, therefore, in examining the findings of fact of the Commission is to ascertain whether or not such findings have support in the record before the Commission.

The Facts.

The petitioner is engaged in the retail grocery business and in conjunction with its affiliates operates more than 14,800 retail grocery stores located throughout the United States. Naturally, it competes with other chain grocery stores and with individuals or corporations operating grocery stores locally within the areas where the petitioner does business. The petitioner has divided the country into six geographical divisions. Each division in turn is divided into a number of units. Each unit contains a warehouse. Each division has a purchasing director. Each warehouse also employs a purchasing director or buyer. The purchasing directors and the warehouse buyers have the authority to purchase the commodities and products required by the petitioner to maintain its many stores.

In addition to the foregoing, the petitioner maintains a number of central buy-

ing offices. These are located in key cities, as, for example, in New Orleans, Baltimore and San Francisco. These central buying offices are in charge of agents of the petitioner. The salaries of these agents are paid by the petitioner as are the expenses of maintaining the offices. The Commission found as a fact that the duties of these agents consist of continuously searching for and finding sources of supply for the petitioner's stores, of furnishing the petitioner with market information, and of purchasing commodities for the petitioner.[1] The field buyers have no authority to make purchases except upon the instructions of the purchasing directors and the warehouse buyers. The field buyers are constantly in touch with these officers however. The Commission also found as a fact that prior to June 19, 1936, the petitioner designated these agents as "brokers"; next referred to them as "purchasing agents"; next as "field buying agents" or simply as "buyers".[2] They are in fact field contact men who are and remain in touch with sellers and prospective sellers of commodities. Their duties in no wise changed with their change of name.

It is in respect to the duties, obligations and labors of these buyers or field buying agents that the controversy at bar arises. The petitioner points out that the field buyers furnish sellers with certain services. For example, the record shows that they exchange information as to market conditions with sellers. They visit manufacturing establishments and advise managers as to methods whereby the quality of commodities may be improved. They also advise manufacturers as to the sizes of containers. They furnish sellers with traffic information as to the routing of commodities purchased by the petitioner. When sellers are threatened with a glut of commodities which may break the market, the field buying agents call the existence of such conditions to the attention of the divisional purchasing directors who endeavor to relieve the glut by buying commodities.

The petitioner contends that these services are of great value and exceed those customarily rendered by brokers, and takes the position that these field buying agents "perform substantially the same services

and functions as a broker, namely, to bring buyer and seller together; to act as intermediary and to serve both" and that sellers did not sell "to the field man but *through* him, and that, in consequence, their sales to the petitioner were not *direct* sales."[3] The petitioner also contends that one of the outstanding services rendered by the field buying agents is in preventing sellers from selling their products or commodities at too low a price. The Commission found as a fact, however, that "the loyalty and allegiance" of the field buying agents "are due solely to the Respondent and in all matters and transactions participated in by said field buying agents relative to or in connection with the business of Respondent or the purchase of commodities by or the sale thereof to the Respondent, said field buying agents devote their loyalty and allegiance solely to the Respondent."[4]

It is clear that prior to June 19, 1936, the effective date of the Robinson-Patman Act, the sellers paid brokerage to the field buying agents of the petitioner in the same amounts as were paid by the sellers to brokers acting as agents for such sellers. Such brokerage was received by the field buying agents on behalf of the petitioner and was paid by them to the petitioner.

Within a comparatively short time after June 19, 1936, the petitioner issued new instructions to its field buying agents. These instructions provided that the field buyers should accept no further brokerage from the sellers on purchases of commodities and should make all future purchases for the petitioner on one of three bases. These bases required the field buying agents to adopt one of the following methods in dealing with sellers: (1) To purchase commodities and products for the petitioner for a net price which was to reflect a reduction from the sellers' prices to other customers or from the general market price, this reduction reflecting in amounts brokerage paid by the sellers to the field buying agents of the petitioner prior to June 19, 1936, being also amounts equivalent to amounts currently paid by the sellers to brokers; (2) to execute "quantity discount agreements" with the sellers, these agreements providing for payment to the petitioner monthly as a "quantity discount" an amount equal to the brokerage paid

[1] Paragraph Five of the Findings of Fact.
[2] Paragraph Six of the Findings of Fact.

[3] Petitioner's brief, at page 10.
[4] Paragraph Nine of the Findings of Fact.

monthly by the sellers to the field buying agents prior to June 19, 1936; and (3) if the sellers were unwilling to sell on the conditions imposed by (1) and (2) above, to make an agreement with sellers whereby the sellers were to keep a record of the brokerage which they would have paid to the field buying agents prior to June 19, 1936 and to pay into escrow or to set up in "abeyance accounts" on their books sums equivalent to such brokerage until the legality of making payments covering such amounts should be determined in the light of the Robinson-Patman Act.

The record shows the purchase by the petitioner of commodities in interstate commerce on each of the three bases enumerated. In respect to basis (2), supra, it also appears that some agreements were made to operate retroactively from the dates of execution to June 19, 1936. It further appears that while the quantity discount agreements purported to require the petitioner to purchase specified quantities of commodities in order that the discount might be earned, there is evidence that the petitioner received discounts whether the quantity purchasing provisions of the contracts were fulfilled or not.[5]

Other findings of fact of the Commission must be referred to briefly. The Commission found that from the net prices at which the field buying agents purchased commodities for the petitioner subsequent to June 19, 1936, the field agents deducted from the sellers' current prices to their customers an amount equal to the brokerage which would have been paid to the field buying agents by the sellers prior to the passage of the Robinson-Patman Amendment. As to purchases under the quantity discount agreements, the amounts of the discounts were paid by the sellers to the petitioner. These amounts were substantially equivalent to the sums paid by these sellers to the field buying agents prior to June 19, 1936.[6] In respect to purchases not made for net prices or under quantity discount agreements, petitioner required the sellers to pay the brokerage into escrow or set up abeyance accounts made by the field buying agents for the petitioner.[7]

The net prices at which the field buying agents purchased commodities for the petitioner did not precisely reflect exact amounts of brokerage because such would result frequently in a sale price involving fractions, contrary to the usages of the trade. The Commission found as a fact that the petitioner "instructed its field buying agents to avoid the use of such fractions wherever possible in agreeing upon the net price to be paid for commodities by the Respondent so that said net prices would not appear to involve any allowance in lieu of brokerage".[8] The Commission also found that with "extremely few exceptions" the petitioner was the only customer of such sellers to whom such sellers sold commodities upon the bases indicated above.[9]

The Commission also found that when the field buyers purchased commodities from sellers brokerage services were neither used nor invoked by either the sellers or the petitioner; that the sellers did not receive the benefit of brokerage services, but that nonetheless the petitioner "obtains, receives and accepts the equivalent of brokerage currently paid by sellers to their brokers for brokerage services actually rendered to said sellers by their said brokers in selling commodities for said sellers."[10] The Commission also found that when services are performed by brokers representing sellers, viz., finding customers for such sellers, brokers act under the control of the sellers and sell commodities to the customers for such sellers and that brokers' functions as selling agents and the services rendered by them are a selling service for those by whom they are employed.[11] The Commission also found that in all matters and transactions whereby the field buying agents purchased commodities for the petitioner or dealt with sellers in connection with the purchase of commodities, the services of the field buying agents were intended to be and were in fact rendered to the petitioner solely and that the field buying agents are subject to the sole control of the petitioner and do not represent or purport to represent themselves to be agents for the sellers nor ren-

---

[5] Paragraph Fourteen of the Findings of Fact.

[6] Paragraphs Fourteen (b), Nineteen, and Twenty-five, Idem.

[7] Paragraphs Fourteen (c) and Sixteen, Idem.

[8] Paragraph Seventeen of the Findings of Fact.

[9] Paragraph Eighteen, Idem.

[10] Paragraph Nineteen, Idem.

[11] Paragraph Twenty-one, Idem.

der any brokerage or selling service to the sellers.[12]

The Commission also found that subsequent to June 19, 1936, the petitioner purchased commodities through its field buying agents upon the bases indicated in (1) and (2) supra, and has received and accepted allowances and discounts in lieu of brokerage.[13]

Concluding its findings of fact the Commission states: "The effect of the receipt of allowances and discounts in lieu of brokerage by the Respondent has been, and will continue to be, to cause substantial injury to competition between those sellers who have granted and paid such allowances and discounts to the Respondent and those sellers who have refused to do so, in that there has been and there will continue to be a diversion of Respondent's business from the latter to the former, and the effect of the receipt of allowances and discounts in lieu of brokerage by the Respondent has a direct and immediate tendency substantially to injure, destroy and prevent competition between Respondent and Respondent's competitors in the resale of commodities upon the purchase of which the Respondent receives discounts and allowances in lieu of brokerage in that the Respondent, by the receipt of such discounts and allowances in lieu of brokerage, is enabled to and does purchase commodities at prices substantially lower than the prices at which its competitors can and do purchase the same commodities from the same sellers and the Respondent is thereby enabled to resell said commodities at prices substantially lower than the prices at which its competitors can resell said commodities."[14]

The petitioner takes the position that two issues of fact are presented by the pleadings. The first is whether or not the petitioner through its field buying agents rendered services to sellers in connection with the purchases of commodities by the petitioner. The second is whether or not the petitioner received net prices, allowances or discounts in lieu of or as the equivalent of brokerage resulting in discriminatory prices prohibited by the Amendment.

As to the first question, it is the petitioner's position that the net prices, allowances and discounts received by the peti-

tioner from the sellers as arranged by its field buying agents or sums now held in escrow or upon abeyance accounts upon the books of the sellers, were for services rendered by its field buying agents to such sellers. Therefore, says the petitioner, it is not within the prohibition of section (c) of the Amendment. The difficulty presented by the petitioner's position, however, is that the evidence in no wise supports its contention that the net prices, allowances, discounts, escrow sums or abeyance accounts received by or made available to the petitioner by the sellers were made available or paid to the petitioner because of the alleged services rendered by its field buying agents to sellers. The great weight of the evidence indicates the contrary. The net prices, discounts and allowances received by the petitioner, the setting up of abeyance accounts and escrow sums for its benefit are nothing more than devices put into effect by the petitioner in attempted avoidance of the prohibitions of the Robinson-Patman Act. It would be fruitless to pursue this issue of fact further.

In respect to the second question, the petitioner contends that the net prices given to it by sellers were possible because of saving of brokerage; that in addition to brokerage other savings were effected to which the petitioner became entitled because of the contact maintained by the field buying agents with the sellers. The petitioner points out that the sellers were saved traveling expenses, salesmen's salaries and commissions, telephone and telegraph charges, the expense of correspondence with brokers and salesmen. Therefore, says the petitioner, the prices paid by it were not discriminatory, since reductions in price were paid for by valuable services. Inherent in these very arguments which the petitioner makes is the inescapable conclusion that the sums "saved" to the sellers allegedly because they were not compelled to pay brokers, were not saved to them at all, but were merely translated into another form to the financial benefit of the petitioner. In regard both to net prices and quantity discounts, the Commission found as a fact that "some sellers effect savings other than brokerage on purchases made for the Respondent by the Respondent's field buying agents, but the only savings represented by the net prices and quantity discounts * * * were

---

[12] Paragraphs Twenty-two and Twenty-three of the Findings of Fact.

[13] Paragraphs Twenty-four and Twenty-five, Idem.

[14] Paragraph Twenty-six of the Findings of Fact.

brokerage savings accruing to sellers as a result of having themselves made sales to the Respondent without invoking or using the selling or brokerage services of another, and no savings other than brokerage services were intended to be, or were, passed on by sellers to the Respondent or received by the Respondent from sellers.[15]

We entertain no doubt that the petitioner's receipts of net prices, allowance and discounts in lieu of brokerage injured competition.

In conclusion we state that we have carefully examined the findings of the Commission and the record. Not only are the findings of fact made by the Commission supported by the evidence, but we state as our opinion that the Commission properly could have reached no other conclusions than those expressed.

### The Law.

The petitioner presents three questions of law which it contends must be decided in its favor. We will deal with these questions in the order which seems most convenient.

Section 1(c) of the Robinson-Patman Amendment provides that "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid."

*1. Subsection (c) Contains an Absolute Prohibition of Payments or Allowances of Brokerage or Sums in Lieu of Brokerage From Sellers to Buyers.*

The petitioner contends that the "services rendered" clause of paragraph (c), supra, provides an exception to the prohibition expressed in the paragraph by reason of which "a commission, brokerage * * * or any allowance or discount in lieu thereof" may be paid lawfully to a buyer upon purchases made by him. We are of the contrary opinion and believe that paragraph (c) expresses an absolute prohibition of the payment of brokerage or compensation in lieu thereof to the buyer upon the buyer's own purchases. If the contention of the petitioner be accepted, all the words employed by Congress in the paragraph after the "services rendered" clause become meaningless and unnecessary. The Circuit Courts of Appeals for the Second and Fourth Circuits respectively have passed upon this question in the cases of Biddle Purchasing Company v. Federal Trade Commission, 2 Cir., 96 F.2d 687, certiorari denied 305 U.S. 634, 59 S.Ct. 101, 83 L. Ed. 407; and Oliver Brothers v. Federal Trade Commission, 4 Cir., 102 F.2d 763.

In the Biddle case, 96 F.2d at page 691, the Court of Appeals of the Second Circuit states: "Congress must have intended that payments by sellers should not be made to buyers through any one acting as agent for the buyer. * * * If buyers' agents or intermediaries are excepted for services rendered, so too are the buyers themselves. The intent of Congress must be recognized and applied and this may best be given effect by a construction of the phrase 'except for services rendered' that will harmonize with the remainder of the section. As the House and Senate Committee said, the intermediary is entitled to nothing more than 'appropriate compensation by the one in [whose] interest he so serves,' and one who acts in such capacity may not receive fees from the seller when he is under contract and does in fact turn over such fees to the buyer."

In the Oliver case the Circuit Court of Appeals for the Fourth Circuit stated [102 F.2d 769]:

"We come * * * to the * * * question * * * whether the brokerage commissions here involved come within the exception contained in section 2(c), i. e., are they paid for services rendered to the sellers? A sufficient answer to the question is found in the fact that the commissions are received by the buyers and not by Oliver, and that there can be no contention that any services are rendered by the buyers to justify the payment of compensation to them. * * *

"If [services rendered] were a sufficient basis to bring the allowance of brokerage commissions within the exception of the section, every purchasing agent for a chain of stores might lawfully receive such commissions; for he does for the stores of his chain precisely what is done by Oliver for

---

[15] Paragraph **Twenty** of the **Findings of Fact.**

the subscribers to its service and benefits the sellers in making sales in precisely the same way. We have no doubt that it was just this sort of thing that it was the purpose of the act to prevent. * * *

"Because of the buying power possessed by purchasing agents, whether representing chains or independent dealers, sellers may be willing to allow them brokerage commissions and may consider such · commissions earned in the sense that the sellers are thus enabled to sell goods without resorting to other sales devices; but the fact remains that the buyer who receives the brokerage allowed his purchasing agent receives an advantage, and a concealed advantage, which the buyer who purchases directly from the dealer does not receive. It was this sort of discrimination, we think, which it was the purpose of this section of the Act to forbid."

The facts of the Biddle and Oliver cases are very similar to those of the case at bar. In the Biddle and Oliver cases, the seller-respondents were required by the Commission to cease the payment of brokerage intended for transmission to the purchasing companies, and the Biddle and Oliver Companies were required to cease accepting such brokerage. As we have stated, in the case at bar the petitioner contends that services of such a character were rendered by the petitioner's field buying agent to the sellers as to justify the payment of compensation to the petitioner. We have indicated heretofore our estimation of the true value of such services, but assuming them to be of the nature and character which the petitioner alleges, nonetheless the consideration received by the petitioner from the sellers on account of them is within the prohibition of the statute which is absolute.

We are required to give full effect to the words employed in the Amendment. We refer to House Report No. 2287, 74th Congress, Second Session, at page 3, and to the same report, at page 15. ·It is there stated that paragraph (c) "permits the payment of compensation by a seller to his broker or agent for services actually rendered in his behalf; likewise by a buyer to his broker or agent for services in connection with the purchase of goods actually rendered in his behalf; but it prohibits the direct or indirect payment of brokerage *except for services rendered., It prohibits its allowance by the buyer direct to the seller or, the seller direct to the buyer; and it prohibits its payment by either to an agent or intermediary in fact for or in behalf, or subject to the direct or indirect control of the other."* We have italicized the words of particular import in the language quoted. Language employed in Senate Report No. 1502, 74th Congress, Second Session, is to similar effect.

At each stage of its enactment, paragraph (c) was declared to be an absolute prohibition of the payment of brokerage to buyers or buyers' representatives or agents. Such is the plain intent of the Congress and thus we construe the statute. Any other result would frustrate the intent of Congress. Exceptions contained in statutes are to be construed strictly. United States v. Scharton, 285 U.S. 518, 521, 52 S.Ct. 416, 76 L.Ed. 917; Spokane & Inland Empire R. Co. v. United States, 241 U.S. 344, 36 S.Ct. 668, 60 L.Ed. 1037; Rochester Telephone Corp. v. United States, D.C., 23 F. Supp. 634, affirmed 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147.

The petitioner takes the position that its field buying agents may act properly both as agents for the petitioner and for those that sell to it; that is to say, may serve both as the agents of the vendee and the vendors. The question presented, however, is not one of propriety of agents serving in dual capacity. Such a course was not prohibited by the common law if the status of the dual agency was disclosed fully. The question presented for our consideration is simply whether or not the vendee may be compensated for services rendered by the vendee's agent acting as agent for the vendors. It is obvious that dual representation by agents opens a wide field for fraud and oppression. Conflicting interests are always engaged when an attempt is made by buyers and sellers to arrive at a market price for commodities. We entertain no doubt that it was the intention of Congress to prevent dual representation by agents purporting to deal on behalf of both buyer and seller. For this reason· paragraph (c) is framed by disjunctives. The edge of the paragraph cuts two ways, prohibiting the payment or receipt of commissions, discounts or brokerage to the adversary party by the other's agent. The phrase "except for services rendered" is employed by Congress to indicate that if there be compensation to an agent it must be for bona fide brokerage, viz., for actual services rendered to his principal by the agent. The agent cannot serve two masters, simultaneously rendering services in an arm's

length transaction to both. While the phrase, "for services rendered", does not prohibit payment by the seller to his broker for bona fide brokerage services, it requires that such service be rendered by the broker to the person who has engaged him. In short, a buying and selling service cannot be combined in one person.

Paragraph (c) was intended to effect and did effect a change in the law. Congress had ascertained that trade practices such as those employed by the petitioner prior to June 19, 1936 resulted in unfair competition. Prior to the passage of the Robinson-Patman Amendment the petitioner received brokerage in monthly installments from sellers. Following the amendment, the petitioner inaugurated the three methods heretofore referred to to avoid that which the Act forbade. As we have stated the attempted avoidance is unsuccessful. The record clearly requires the conclusion that the field buying agents of the petitioner were the agents of the petitioner and that such services as were rendered by them to sellers were purely incidental to such representative capacity. For such incidental services, the petitioner may not be compensated.

2. *Paragraphs (a) and (c) Possess Separate Significance and are Independent of Each Other.*

The petitioner contends that the Commission has treated paragraph (c) as a wholly independent statute which may not be construed in the light of the Amendment as a whole. What the Commission stated in

respect to this issue is as follows: "Paragraph (c) is complete on its face. It contains no ambiguous language necessitating reference to paragraph (a) for the purpose of determining its meaning. It deals specifically with a particular trade practice which was regarded by Congress as an unfair method of competition, per se injurious to commerce, and therefore to be prohibited. The intention of Congress to treat paragraph (c) as independent of paragraph (a) is apparent from both the form of the Robinson-Patman Act and from its legislative history."

In its argument to this court and upon its brief, the petitioner states that it pleaded that if paragraph (c) of Section 1 of the Act "* * * was to be construed as standing alone and independent of any other provision of the Act and as simply preventing parties from making a contract which had no relation to discriminatory prices, or without regard to any injurious effect on competition, it was unconstitutional."[16] Actually, however, the petitioner pleaded that paragraph (c) "* * * was unconstitutional and void, because * * * it deprives persons of the right to contract irrespective of the effect of such contracts on commerce and seeks to make unlawful an agreement between persons with respect to the payment for services without regard to the effect on interstate commerce of such services * * *". The petitioner now contends, however, that net prices, allowances and discounts may be passed on to buyers under the cost differentials proviso in paragraph (a).[17]

[16] Petitioner's brief, page 2.

[17] Paragraph (a) provides: "(a) Price; selection of customers. It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: Provided, That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: Provided, however, That the Federal Trade Commission may, after due investigation and hearing to all interested parties, fix and establish quantity limits, and revise the same as it finds necessary, as to particular commodities or classes of commodities, where it finds that available purchasers in greater quantities are so few as to render differentials on account thereof unjustly discriminatory or promotive of monopoly in any line of commerce; and the foregoing shall then not be construed to permit differentials based on differences in quantities greater than those so

It would be well at this point we think to discuss briefly Section 1 as a whole. Paragraph (a) deals with the selection of customers and provides that it shall be unlawful to discriminate in price between them. Then follow the cost differential provisos upon which the petitioner relies. Paragraph (b) provides that the burden of rebutting a prima facie case of discrimination rests upon the person charged with a violation of the Section. Paragraph (c) prohibits the payment or acceptance of commission or brokerage or other compensation, except for services rendered, as we have indicated. Paragraph (d) provides that it shall be unlawful to pay or contract for the payment of anything of value for services or facilities unless such payment or consideration is available on proportionally equal terms to all other customers competing in distribution of such products or commodities. Paragraph (e) prohibits the furnishing of services or facilities for processing or handling upon terms not accorded to all purchasers on proportionally equal terms. Paragraph (f) prohibits persons from knowingly receiving a discrimination in price prohibited by Section 13.

Section 3 of the Robinson-Patman Act, 15 U.S.C.A. § 13a, to which the petitioner specifically refers, makes it unlawful "to be a party to, or assist in" a purchase or sale "which discriminates to his knowledge against competitors of the purchaser" by means of "any discount, rebate, allowance, or advertising service charge" not available to those in competition with such purchaser, or to sell at a lower price in one territory than another, or to sell at an unreasonably low price for the purpose of destroying competition or eliminating a competitor.

 Relying upon the foregoing, the petitioner contends that the legislative intent was to prevent price discriminations having a prejudicial effect on competition or which tended to lead to monopoly. We are of the opinion that this was the intention of Congress and the Act as a whole

represents such legislative intent. We also conclude that paragraph (c) must be construed in the light of the Act and the evils which the Act was intended to remedy. The petitioner, however, takes the position that the language of paragraphs (a) and (c) is intended to be read together. If it be the case that the cost differentials provisos of paragraph (a) become part of and must be read into the language of paragraph (c), then it is obvious that the petitioner is entitled to the relief it seeks from this court for the complaint of the Commission against the petitioner in this case is based on the proposition that an offense prohibited by the Act is made out by the petitioner's acceptance of allowances and discounts in lieu of brokerage. As the petitioner says, no other allegation is made. In other words, if the allowances and discounts in the case at bar be deemed to be permissible by reason of the cost differential provisos of paragraph (a), it is clear that the petitioner is entitled to have the cease and desist order of the Commission set aside.

This precise question was raised in the Biddle case. The Court there stated (96 F.2d at page 690): "It is argued that section 2(c), 15 U.S.C.A. § 13(a), under which this proceeding is brought, is to be construed in the light of section 2(a), and that, so construed, the payment or receipt of the brokerage is illegal only when it has such effect upon competition as is provided in section 2(a). The argument is that the receipt of brokerage here would be illegal only if it restricts competition or restrains trade or injures a competitor. But no complaint is made against Biddle Company or the other petitioners for this reason. The complaint here is under the provisions of section 2(c) and not section 2(a) of the statute. The validity of the order entered is dependent entirely upon the legality of section 2(c)."

A similar contention was made in the Oliver case. The court there stated (102 F.2d at pages 766, 767):

"The argument is made that the provi-

---

fixed and established: And provided further, That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade: And provided further, That nothing herein contained shall prevent price changes from time to time where in re-

sponse to changing conditions affecting the market for or the marketability of the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods, obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods concerned."

sions of section 2(a) with respect to limitation of competition or tendency to create monopoly must be read into section 2(c) * * * Must the Robinson-Patman Act be so construed? * * * We think that [the question] must be answered in the negative.

"The Robinson-Patman Act * * * was an amendment of the Clayton Anti-Trust Act * * * Section 2 of the Clayton Act, which was the section amended, merely forbade discrimination in price when the effect of such discrimination was to substantially lessen competition or tend to create monopoly. The Robinson-Patman Act broadened the scope of this provision, conferred upon the Federal Trade Commission power to establish quantity differentials * * * and cast the burden of proof upon one charged with discrimination to justify any discrimination shown. Receipt of price discrimination was made unlawful for the first time, section 2(f) * * * and three specific matters were forbidden as unfair trade practices by subsections (c), (d) and (e), viz.: the granting of commission or brokerage, or any allowance in lieu thereof, to the other party to the transaction or his agent, the making of discriminatory payments by seller to buyer for services rendered by the latter and discrimination by the seller in the rendering of services to the buyer. It is perfectly clear that all three of these practices were forbidden because of their tendency to lessen competition and create monopoly, without regard to their effect in a particular case; and there is no reason to read into the sections forbidding them the limitations contained in section 2(a) having relation to price discrimination, which is an extremely difficult matter to deal with and is condemned as unfair only in those cases where it has an effect in suppressing competition or in tending to create monopoly. The forbidding of specific practices because of their tendency toward a general result, also forbidden, is familiar legislative practice; and no reason suggests itself why the limitations and provisions relating to one should be read into those relating to the other."

■ We will state briefly our reasons for reaching a similar conclusion. An examination of paragraph (a) shows that it deals with discriminations in price gener-

ally. Paragraph (c) upon the other hand deals in particular with a trade practice which has frequently resulted in price discriminations and unfair competition. It is obvious that by its express language paragraph (c) must be applied only to transactions occurring in the course of interstate commerce. Paragraph (a) prohibits price discriminations "where either or any of the purchases involved in such discrimination are in commerce." In this connection the House Committee[18] stated that the clause just quoted is of "first importance in extending the protections of this bill against the full evil of price discrimination, whether immediately in interstate or intrastate commerce, wherever it is of such a character as tends directly to burden or affect interstate commerce." Paragraph (a) is plainly directed toward price discrimination, no matter how arising, so long as it injures competition or affects the stream of commerce. Paragraph (c), upon the other hand, deals with one particular subject, viz., allowances and discounts in lieu of brokerage or brokerage of such nature and kind that commerce generally is affected thereby. In other words, paragraph (c) constitutes a specific prohibition of a specific act and the acts committed by the petitioner are within such prohibition. To read the words of paragraph (a) into paragraph (c) destroys the Congressional intent.[19] For example the language of paragraph (b) relates to proceedings brought pursuant to the provisions of paragraphs (a) and (e) but are not applicable to proceedings instituted under paragraphs (c) or (d). Thus viewed, the provisions of all the paragraphs of Section 2 are consistent and deal logically with their respective subjects. The respective paragraphs must be read with due regard for the provisions of each.

*If Paragraph (c) be Construed as an Absolute Prohibition of Payment or Allowance of Brokerage or Sums in Lieu of Brokerage to Buyers, it is Nonetheless Constitutional.*

■ As was stated in Texas & N. O. R. Co. v. Brotherhood of Railway & Steamship Clerks, 281 U.S. 548, 570, 50 S. Ct. 427, 433, 74 L.Ed. 1034, the power of Congress "to regulate commerce is the power to enact 'all appropriate legislation' for its 'protection or advancement'

---

[18] House Report No. 2287, 74th Congress, Second Session, at p. 8.

[19] Senate Report No. 1502, 74th Congress, Second Session, at page 5.

* * * to adopt measures 'to promote its growth and insure its safety' * * * to 'foster, protect, control, and restrain' ". The plenary power of Congress to such ends is subject solely to the limitations imposed by the Constitution. It is not the duty of the courts to inquire into the policy of the law making body. Congress determines the evil to be attacked and supplies the remedy. As was stated by the Supreme Court in Old Dearborn Distributing Co. v. Seagram-Distillers Corporation, 299 U.S. 183, 196, 57 S.Ct. 139, 145, 81 L. Ed. 109, 106 A.L.R. 1476, if "the question may be regarded as fairly open to differences of opinion * * * the legislative determination * * * is conclusive."

The Fifth Amendment to the Constitution U.S.C.A. does not serve to prohibit the exercise by Congress of its power under the Commerce Clause art. 1, § 8, cl. 3. Liberty of contract may be so limited. Tagg Brothers & Moorhead v. United States, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524; Chicago, B. & Q. R. R. Co. v. McGuire, 219 U.S. 549, 31 S.Ct. 259, 55 L.Ed. 328; Liberty Warehouse Co. v. Burley Tobacco Growers' Co-op. Marketing Association, 276 U.S. 71, 48 S.Ct. 291, 72 L.Ed. 473; Highland v. Russell Car & Snow Plow Co., 279 U.S. 253, 49 S.Ct. 314, 73 L.Ed. 688; O'Gorman & Young, Inc., v. Hartford Fire Insurance Co., 282 U.S. 251, 51 S.Ct. 130, 75 L.Ed. 324, 72 A.L.R. 1163; Hardware Dealers' Mutual Fire Ins. Co. v. Glidden Co., 284 U.S. 151, 52 S.Ct. 69, 76 L.Ed. 214; Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469. Moreover, Congress is not required to limit the exercise of its power under the Commerce Clause upon the effect of forbidden acts in particular instances. It may proceed generally for the protection of commerce in general, expressing its disfavor of certain acts as hurtful to competition in such terms as it sees fit so long as it does not transgress the boundaries imposed by the Constitution. See Reid v. Colorado, 187 U.S. 137, 23 S.Ct. 92, 47 L.Ed. 108; Champion v. Ames, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492; United States v. Delaware & Hudson Co., 213 U.S. 366, 29 S.Ct. 527, 53 L.Ed. 836; United States v. Delaware, L. & W. R. R. Co., 238 U.S. 516, 35 S.Ct. 873, 59 L.Ed. 1438; Hipolite Egg Co. v. United States, 220 U.S. 45, 31 S.Ct. 364, 55 L.Ed. 364; Clark Distilling Co. v. Western Maryland Ry. Co., 242 U.S. 311, 37 S.Ct. 180, 61 L.Ed. 326, L.R.A.1917B, 1218, Ann.Cas.1917B, 845; Oregon-Washington R. & N. Co. v. Washington, 270 U. S. 87, 46 S.Ct. 279, 70 L.Ed. 482; Kentucky Whip & Collar Co. v. Illinois Central R. Co., 299 U.S. 334, 57 S.Ct. 277, 81 L.Ed. 270; United States v. Carolene Products Co., 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234; Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092; United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999; Electric Bond & Share Co. v. Securities & Exchange Commission, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105; Central Elevator Co. v. People ex rel. Moloney, 1898, 174 Ill. 203, 51 N. E. 254, 43 L.R.A. 658; Crescent Cotton Oil Co. v. Mississippi, 257 U.S. 129, 42 S.Ct. 42, 66 L.Ed. 166; Paramount Pictures v. Langer, D.C., 23 F.Supp. 890.

The practice of paying brokerage, or sums in lieu of brokerage, to buyers or their agents by sellers was found by Congress to be an unfair trade practice resulting in damage to commerce. Paragraph (c) prohibits such practice. We conclude that Congress has properly exercised its power to the end that the named abuse may be done away with. We refer also to the conclusions expressed in the decision in the Biddle case, 96 F.2d at page 692, and in the Oliver case, 102 F.2d at page 769.

A decree will be entered affirming the Commission's order and commanding the petitioner to obey it. See 15 U.S.C. § 45 as amended. 15 U.S.C.A. § 45.

### APPENDIX.

Order to Cease and Desist.

United States of America.

Before Federal Trade Commission.

At a regular session of the Federal Trade Commission held at its office in the city of Washington, D. C., on the 25th day of January, A. D., 1938.

Commissioners: Garland S. Ferguson, Jr., Chairman, Charles H. March, Ewin L. Davis, William A. Ayres, Robert E. Freer.

Docket No. 3031.

This proceeding having been heard by the Federal Trade Commission upon the complaint of the Commission, the answer of The Great Atlantic & Pacific Tea Company, Respondent, testimony and other evidence, taken before William C. Reeves, an Examiner for the Commission theretofore duly designated by it, in support of the allegations of said complaint and in opposition thereto, briefs filed in support of

said complaint and in opposition thereto and the oral arguments of J. J. Smith, Jr., counsel for the Commission, and Caruthers Ewing, counsel for the Respondent, and the Commission having made its Findings as to the Facts and its Conclusion that the said Respondent has violated, and is now violating, the provisions of an Act of Congress approved October 15, 1914, 38 Stat. 730, entitled "An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes" as amended by an Act of Congress approved June 19, 1936, 49 Stat. 1526, entitled "An Act to amend section 2 of the Act entitled 'An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes', approved October 15, 1914, as amended (U.S.C. Title 15, Sec. 13 [15 U.S.C.A. § 13]) and for other purposes";

It is ordered that in purchasing commodities in interstate commerce from sellers who are engaged in selling commodities in interstate commerce to the Respondent, The Great Atlantic & Pacific Tea Company, and to purchasers thereof other than the Respondent, the said Respondent, The Great Atlantic & Pacific Tea Company, do forthwith cease and desist from:

1. Making purchases of commodities, and the policy and practice of making purchases of commodities, at a so-called net price, and every other price, which reflects a deduction or reduction, or is arrived at or computed by deducting or subtracting, from the prices at which sellers are selling said commodities to other purchasers thereof any amount representing, in whole or in part, brokerage currently being paid by sellers to their brokers on sales of said commodities made for said sellers by, or by said sellers through, their said brokers, and:

2. Accepting, and the policy and practice of accepting, on its purchases of commodities from sellers any so-called quantity discounts and payments of all kinds representing, in whole or in part, brokerage currently being paid by sellers to their brokers on sales of said commodities made for said sellers by, or by said sellers through, their said brokers, and:

3. Accepting, and the policy and practice of accepting, on its purchases of commodities from sellers prices reflecting, and all allowances and discounts representing, brokerage savings effected by sellers on their sales of commodities to the Respondent.

4. Accepting, and the policy and practice of accepting, on its purchases of commodities all allowances and discounts in lieu of brokerage, in whatever form said allowances and discounts may be allowed, granted, paid or transmitted to the Respondent.

It is further ordered that the Respondent shall, within sixty (60) days after service upon it of this order, file with the Commission a report in writing setting forth in detail the manner and form in which it has complied with this order.

By the Commission.