PACKER PUBLISHING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 26369. Promulgated November 28, 1951.

*Charles C. Shafer, Jr., Esq.*, and *Lancie L. Watts, Esq.*, for the petitioner.

*William J. Stetter, Esq.*, for the respondent.

884

888

894

OPINION.

I.

OPPER, *Judge:* Petitioner's claim for relief under section 722, Internal Revenue Code, was founded upon four propositions: (1) That the earnings of its trade journals, The Packer and The Produce Packer, were "depressed in the base period because of temporary economic circumstances unusual"[1] in its case or in the case of its industry, within the scope of subsection (b) (2); (2) that its business was "depressed" during the base period by reason of being subjected to "a profits cycle differing materially in length and amplitude from the general business cycle,"[2] under subsection (b) (3) (A); (3) that its comic supplement printing activity underwent a "change in the character of"[3] its business during the base period entitling it to relief

---

[1] (b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

    \*      \*      \*      \*      \*      \*      \*

    (2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry

[2]     (3) the business of the taxpayer was depressed in the base period by reason of conditions generally prevailing in an industry of which the taxpayer was a member, subjecting such taxpayer to

        (A) a profits cycle differing materially in length and amplitude from the general business cycle, or

[3]     (4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purpose of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation  \*  \*  \*

as provided in subsection (b) (4) ; and (4) that (b) (5) was operative.

Petitioner has now expressly waived its claim under the last mentioned subsection, and has, in addition, withdrawn all requests for relief as applied to The Produce Packer. Of the remaining questions under section 722, we shall for convenience first consider the applicability of (b) (3) (A).

## II.

There are numerous flaws in the statement and implementation of this aspect of petitioner's contention, but we disregard the subsidiary and concentrate on the central fallacy. The purpose of the "cycle" provision, as its language and background make clear, is to protect from discriminatory treatment the business which, by reason of its peculiar cycle, was in a depression phase of its development during the base period, thus using an unreasonably low comparative, as related to the general economy, to measure its subsequently earned excess profits. *Roy Campbell, Wise & Wright, Inc.*, 15 T. C. 894.

Petitioner's witness testified, in support of its claim under this provision, that petitioner's was "a seventeen-year profit cycle extending from 1919 to 1935." [4] This would, of course, call for the beginning of a new and comparable cycle in 1936, with the 4 years 1936 through 1939 being roughly comparable to those from 1919 through 1922.[5] To achieve the objective of section 722 (b) (3) (A) it would hence be necessary to show that petitioner's history had been one of depression in the earlier 4-year period, thus indicating a similarly depressed condition in the base period.

The facts, however, are exactly contrary. General business profits for the 1919–1922 period averaged annually 134.6 per cent of the 1919–1935 average, while petitioner's profits for the same period were averaging 177 per cent of its 1919–1935 profits.[6] Petitioner's own yearly income averaged $72,198 for 1919–1923, as against $39,493 for 1919–1935; and its average annual advertising volume—the principal source of its income—was $320,360 for the 1920–1923 period compared with $254,754 for 1920–1935 and $178,616 for 1936–1939.[7] In other words,

[4] Petitioner's brief, p. 83.

[5] "As students became aware that the problem involved more than the analysis of turning points, they gave increasing recognition to a four-phase cycle, marked by the stages of expansion, recession, depression, and revival. * * *

"In tracing the course of the cycle, one must plunge *in medias res*, that is, choose one of its phases as the starting point. Assuming that we begin with the period of revival the first task is to determine how revival produces the next phase—prosperity. It must then be shown how prosperity produces conditions leading to recession, recession gathers momentum in creating depression, and finally depression ultimately develops into a new revival. * * *

"* * * With the expansion of production, we are back to where we started." Achinstein, "Introduction to Business Cycles," 1950, Thomas Y. Crowell Co., pp. 4, 143, 147.

[6] Computed from table at p. 60 of petitioner's brief.

[7] Taken from tables at p. 36 of petitioner's brief.

either petitioner's witness was mistaken as to its profits cycle, or petitioner's business was, as respondent contends, in a general downward trend, so that the next cycle would, except for the war, have shown constantly decreasing figures as compared to the period 17 years earlier. See *El Campo Rice Milling Co.*, 13 T. C. 775. In neither event could petitioner fall within (b) (3) (A) or show that the base period was an unfair or discriminatory criterion for measuring its excess profits. *Roy Campbell, Wise & Wright, Inc., supra; El Campo Rice Milling Co., supra; Pabst Air Conditioning Corporation*, 14 T. C. 427.

In arriving at this conclusion we express no opinion as to whether petitioner was, as it contends, a member of the fruit and vegetable industry, or in the alternative an industry by itself, or neither. If the last, it has failed in an essential element of its proof, *Pabst Air Conditioning Corporation, supra;* if the second, its cycle, as we have seen, indicates that the base period was a high point for it on the cyclical approach and hence could not have been a "depressed" period as the statute requires; *El Campo Rice Milling Co., supra;* and if the first, it was either typical of its industry, which then would not have been depressed either, or it departed from the industry cycle for peculiarities of its own, which again eliminates relief under (b) (3) (A). *Roy Campbell, Wise & Wright, Inc., supra.* We conclude that subsection (b) (3) (A) has thus been shown to be inapplicable.

## III.

Assuming that a comparison of The Packer's earnings during the base period with those for the entire 20 years ending with it show a comparatively depressed condition, we must look further under (b) (2) since "A declining business or industry which was depressed because of economic conditions of a permanent rather than a temporary nature does not come within" the classification of (b) (2). S. Rept. No. 1631, 77th Cong., 2d Sess., 1942–2 C. B. 504, 650. The depression must come about due to "temporary economic circumstances" unusual for petitioner or its industry. Section 722 (b) (2), *supra.*

In order to carry its burden of showing the existence of that requirement, petitioner resorts to a single assertion—that unfair competition by the Great Atlantic & Pacific Tea Co. during the base period injured the business of its chief advertising customers, the fruit and vegetable wholesalers, and hence reduced their advertising commitments to it.

As corroboration for this position we are referred to the opinion of the Third Circuit Court of Appeals in *Great Atlantic & Pacific Tea Co.* v. *Federal Trade Commission*, 106 F. 2d 667. There a cease and desist order against the A & P was sustained forbidding it to

exact discounts and other favors from fruit and vegetable producers selling to it, on the ground that "petitioner's [A & P's] receipts of net prices, allowance and discounts in lieu of brokerage injured competition."

Assuming that this opinion can be treated as proof of the facts there found, but see *Harlan Bourbon & Wine Co.*, 14 T. C. 97, the effect is to destroy rather than support petitioner's case. True, the decree was entered at about the end of the base period; true also, the forbidden practices appear to have arisen about June 19, 1936, the date of the passage of the Robinson-Patman Act, thus coinciding roughly with the beginning of the base period.

But, as the above quotation and other parts of the opinion demonstrate, the prohibited exactions were merely a substitute for brokerage payments which had previously been required by the A & P but were forbidden by the Robinson-Patman Act. "Congress had ascertained that trade practices such as those employed by the petitioner [A & P] prior to June 19, 1936, *resulted in unfair competition.* Prior to the passage of the Robinson-Patman Amendment the petitioner received brokerage * * * from sellers. Following the amendment, the petitioner inaugurated the three methods heretofore referred to to avoid that which the Act forbade. As we have stated the attempted avoidance is unsuccessful. * * *" (Emphasis added.)

The unfair competition with its customers by the A & P of which petitioner complains is thus a practice of long standing, how long the record does not show exactly, but apparently for at least 20 years. See *Fish Net & Twine Co.*, 8 T. C. 96. Only the form was somewhat different during the base period; the effects were obviously—and assertedly—the same. The "economic event" was consequently not "temporary" nor "unusual." See *Acme Breweries*, 14 T. C. 1034; *Harlan Bourbon & Wine Co.*, *supra.* And passage of the Robinson-Patman Act was not an "economic event" at all. *Acme Breweries, supra.* More important, it could not have accounted for any "depression" of petitioner's business during the base period since, as we noted under II, *supra*, petitioner's profits and advertising contracts were not adversely affected during prior periods when similar practices obtained, but instead show a continual downward trend through its entire demonstrated history. See S. Rept. 1631 *supra*. *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220. It follows that there is no showing of an excessive or discriminatory excess profits computation under (b) (2). See *Industrial Yarn Corporation*, 16 T. C. 681.

## IV.

When we come to the claim under (b) (4), however, more favorable treatment is required. The "change in the character" of peti-

tioner's comic supplement business upon which it relies is a new contract with a new customer under which it was possible to achieve the same production with less labor. The details need not be reiterated. They appear in our findings.

It is adequate to note that the reconstructed base period income as submitted by petitioner and incorporated in our findings makes use of actual 1939 figures as these are involved in the concept of change of business, and actual prior year percentages to the extent that no change in practice is contended for.

Thus, the sales for the 4-year period are reconstructed by using actual sales for the last half of 1939; expenses of labor are based upon actual percentage of 1939 labor to such 1939 sales; but other expense is arrived at by taking the percentage of actual cost to actual sales for the prior years, since petitioner's claim is not based upon any change in such expense, and there is no indication that the percentage of expense to sales would have varied in prior years even had the new contract then been in effect.

We conclude that petitioner is entitled to use a reconstructed base period income under (b) (4) for its comic supplement income and that its method of arriving at such income is reasonable and should be approved. *Wisconsin Farmer Co.*, 14 T. C. 1021.

## V.

Respondent now concedes that if petitioner is entitled to any relief under section 722, it may relate the computation back to the years 1941 and 1942 by means of carry-overs to 1943, one of the years before us. He makes no similar concession for 1944. But his sole objection to the carry-over to that year appears to be that petitioner's claim for relief failed to contain any reference to it. As to this, a closer examination reveals that petitioner's computation of its claim under section 722 for 1944 includes an unused excess profits tax credit from 1942. We view this as a sufficient notice to respondent of petitioner's position. See *Higginson* v. *United States* (Ct. Cl.), 81 F. Supp. 254; *United States* v. *Humble Oil & Refining Co.* (C. A. 5), 69 F. 2d 214. Its reconstructed base period income for the comic supplement business under section 722 accordingly entitles it to carry-overs to both 1943 and 1944 if that turns out to be warranted under the recomputation.

## VI.

There having been no determination of any deficiencies as to income tax or excess profits tax, jurisdiction is lacking to deal with the question whether such relief as is being granted would entitle petitioner to a larger deduction for its manager's bonus which consists of a

percentage of profit after taxes. The proceeding in these respects must be dismissed. *Mutual Lumber Co.*, 16 T. C. 370.

Reviewed as to section 722 by the Special Division.

*Decision will be entered under Rule 50.*