**UNITED STATES v. NEW YORK GREAT ATLANTIC & PACIFIC TEA CO.**

No. 9221.

United States Court of Appeals
Seventh Circuit.

Feb. 24, 1949.

William M. Acton, of Danville, Ill., and William J. Donovan, James V. Hayes, Breck P. McAllister, Henry H. Bond, Robert C. Wilson, Jr., Paul J. Quinn, John A. Morhous and Michael J. O'Neill, all of New York City (Murray T. Quigg, Albert J. O'Connor and Donovan, Leisure, Newton, Lumbard & Irvine, all of New York City, of counsel), for appellants.

Holmes Baldridge, Richard B. O'Donnell, Horace L. Flurry and Earl A. Jinkinson, Sp. Assts. to Atty. Gen., both of Kansas City, Kan., James R. Browning, of Denver, Colo., Margaret H. Brass, Sp. Atty., of Washington, D. C., and Herbert A Bergson, Asst. Atty. Gen., for appellee.

Before MAJOR, Chief Judge, and KERNER and MINTON, Circuit Judges.

MINTON, Circuit Judge.

This case comes to us on appeal from the Eastern District of Illinois. The defendant The New York Great Atlantic & Pacific Tea Company, Inc., herein called A&P, several of its subsidiary and affiliated companies, and certain officers of the A&P chain were found guilty by the District Court of a conspiracy to restrain and to monopolize trade, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S. C.A. §§ 1, 2. The defendants Carl Byoir, the public relations counsel of A&P, and Business Organization, Inc., a corporation through which Byoir conducted such public relations, were also found guilty. The last two defendants have filed separate briefs, while all the other defendants have filed a joint brief. The appeals, however, are separate appeals. We will consider first the appeal of all the defendants except Byoir and Business Organization, Inc.

■ The first question raised by these defendants is whether the alleged standard of proof employed by the District Court was erroneous. The District Court filed a memorandum opinion in the case, which is published in 67 F.Supp. 626, 631, 680. In that memorandum the District Court, after describing the general position of the Government, stated that the Government insisted that under the evidence it had proved beyond all reasonable doubt that the defendants were guilty as charged, "while defendants insist that proper analysis of the evidence can lead only to a conviction that they never at any time intended to violate the law;" that their studied policy was to obey the law, to meet competition fairly, and to sell their merchandise cheaply at a low profit. After stating the contentions of the parties, the District Court said: "It is obvious, therefore, that determination of which is the correct view, or a reconciliation of one with the other, involves the issue of whether the evidence points inevitably, beyond all reasonable doubt, to guilt, or whether it discloses such facts as are consistent only with innocence." This is the statement complained of by the defendants and which they assert shows that the District Court employed an erroneous standard of proof.

This contention of the defendants seems quite unsubstantial to us. As we understand Judge Lindley, he was not laying down any *standard of proof*. He was simply stating that the *issue* was whether the defendants were guilty or innocent as the parties had respectively contended. We do not think Judge Lindley was attempting to instruct himself as to the burden of proof in a criminal case and did so erroneously. Especially when we remember what we know judicially, that Judge Lindley is one of the ablest of trial judges, with more than twenty-five years of experience. He was not talking about standard of proof; he was talking about the contention or issue between the parties of guilt on the one hand, and the contention of innocence on the other. Undoubtedly, the attorneys for the defendants in the trial court were contending, as they did here, for the complete innocence of the defendants. When the statement complained of is considered in its context, we think it is not subject to the attack leveled at it by the defendants. Furthermore, even if we were to concede that Judge Lindley was discussing standards of proof, an examination of his entire memorandum clearly indicates that he applied the correct standard, namely, that the defendants could not be convicted unless their guilt was established by the evidence beyond all reasonable doubt.

■■ The most important question presented in this case arises upon the motion of the defendants for acquittal, made at the conclusion of all the evidence. This raises the question as to the sufficiency of the evidence to support the finding of guilt made by the court, which tried the case without a jury. It needs the citation of no authority to support the proposition that if there is any substantial evidence to support the court's finding, it must be sustained. In this consideration, we look only to the evidence which is favorable to the court's finding and such reasonable inferences as may be drawn from the facts proved. Furthermore, we consider the case here as a whole and not piecemeal. If viewing the evidence as a whole there emerges an overall pattern of guilt as charged, the finding must be sustained.

This is a charge of a conspiracy to restrain trade and to monopolize. Some of the things done by the defendants, when examined and considered separately may be perfectly legal, but when used to promote or further a conspiracy to do an unlawful thing, that which when considered alone is lawful, when used to further the conspiracy becomes unlawful. American Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575; Associated Press v. United States, 326 U. S. 1, 14, 65 S.Ct. 1416, 89 L.Ed. 2013.

The issue is whether there is substantial evidence to show a conspiracy by the defendants to restrain and monopolize trade in commerce in food and food products by controlling the terms and conditions upon which the defendants and their competitors might do business and by oppressing competitors through the abuse of the defendants' mass buying and selling power. The Government insists that this case is not an attack upon A&P because of its size or integration and the power that may rightly go with such size and integration, but it is an attack upon the abuse of that power.

There is substantial evidence in this voluminous record to show the following. The A&P system is comprised of fourteen corporations, twelve of which were named defendants and three of which defendants were ultimately acquitted. The system is completely integrated, both horizontally and vertically. A&P is engaged in the food industry as buyer, manufacturer, processor, broker, and retailer. It operates 5,800 retail stores in forty states and the District of Columbia, and thirty-seven warehouses serve these stores.

The top holding company is the defendant A&P, a New York corporation. The George H. Hartford Trust, of which John A. and George L. Hartford are trustees, owns approximately ninety-nine per cent of A&P. This top holding company owns and controls the whole hierarchy, with very tight control in the hands of the Hartfords. The wholesale warehouses and retail operation of the A&P system are divided up into divisions, units, and stores. The division presidents control the policy of the system, but the Hartfords control the appointment of the division presidents. The Hartfords sit with them in the quarterly division policy making meetings and are a dominating influence at these meetings. On the whole, it is a well disciplined organization, from top to bottom. Ultimate control of buying, with unimportant exceptions, is centralized in headquarters of A&P. In this way, A&P controls the buying policy for the entire system and hence the purchase price of its merchandise. This centralized control also gives A&P control of such things as advertising allowances and label and bag allowances, which are related to the buying.

The buying policy of A&P was to so use its power as to get a lower price on its merchandise than that obtained by its competitors. This policy, as implemented by "direct buying," was referred to by the top officers of A&P as a two-price level, the lower for A&P and the higher for its competitors. It used its large buying power to coerce suppliers to sell to it at a lower price than to its competitors on the threat that it would place such suppliers on its private blacklist if they did not conform, or that A&P would go into the manufacturing business in competition with the recalcitrant suppliers.

The following are some of the techniques used by A&P to get a lower price than its competitors. As early as about 1925, A&P sent its buyers into the field to buy merchandise for it under strict control of headquarters. These buyers were on A&P's payroll and were operating out of its establishments, in offices mostly under their individual names. Their primary object was to get the merchandise for A&P as cheaply as they could, and for this the supplier was compelled, if he obtained the business, to pay A&P a seller's brokerage of from one to five per cent. These so-called brokerage fees went into the coffers of A&P as a further reduction in price. Except on brokerage received from meat packers, which was outlawed in 1934,[1] this system continued until 1936, when it was made illegal by the Robinson-Patman Act, 15 U.S.C.A. §§ 13,

---

[1] Trunz Pork Stores v. Wallace, 2 Cir., 70 F.2d 688.

13a, 13b, 21a. In 1935, gross revenues from this source amounted to $2,500,000.

After 1936, the buyers, instead of getting credit for alleged brokerage, induced their suppliers to reduce their price further to A&P by the amount of the brokerage fee. Thus the allowance became a markdown of the price on the invoice. This was called net buying. When this was outlawed by a decision of the Third Circuit upholding a cease and desist order of the Federal Trade Commission directed at this practice,[2] A&P adopted a policy of direct buying. It thereafter would buy from no one who sold through a broker. Not only would it not buy from suppliers who offered to sell to it through brokers; it would not buy from a supplier who sold to anyone else through brokers. This clearly affected the business of brokers, who resisted as best they could, and as one of the defendant officers said, "these brokers are dieing (sic) hard." This policy also affected the trade that was unable to buy directly. Suppliers were in effect told that if they did not sell direct to all customers, A&P would withdraw its patronage. This policy of direct buying was broadcast to all the trade in a national press release by A&P, and A&P continued to get its usual lower price, which was supposed to be justified by cost savings in such direct buying and because A&P bought in large quantities. This system continued until the trial.

A substantial amount of the discounts A&P received rarely bore a relationship to cost savings. A&P got the largest discount on the basis of "large quantities" purchased, but as pointed out by A&P's attorney, the use of the expression "large quantities" was "definitely misleading." The large discounts A&P got were not for taking large quantities at one time but were based on a large volume purchased over a period of time and delivered in many small shipments. The defendants' attorneys pointed out to them that, "A large volume ordered out in many small shipments rarely involves any savings in and of itself * * *." Whatever the system used or by whatever name designated, A&P always wound up with a buying price advantage. This price advantage given A&P by the suppliers was, it is fairly inferable, not "twice blessed" like the quality of mercy that "droppeth as the gentle rain from heaven." It did not bless "him that gives and him that takes." Only A&P was blessed, and the supplier had to make his profit out of his other customers at higher prices, which were passed on to the competition A&P met in the retail field.

One cannot escape the conclusion on the very substantial evidence here, as one follows the devious manipulations of A&P to get price advantages, that it succeeded in obtaining preferential discounts not by force of its large purchasing power and the buying advantage which goes therewith, but through its abuse of that power by the threats to boycott suppliers and place them on its individual blacklist, and by threats to go into the manufacturing and processing business itself, since it already possessed a considerable establishment and experience that would enable it to get quickly and successfully into such business if a recalcitrant supplier, processor, or manufacturer did not yield. The A&P organization was urged to keep secret whatever preferences it received. These predatory discounts and other preferences amounted to 22.15% of A&P's total profits in 1939; 22.47% in 1940; and 24.59% in 1941.

The influence of this ruthless force in the food buying field was also used to compel suppliers to discontinue practices in their business which might be detrimental to A&P. For instance, some A&P suppliers were making store door deliveries to A&P competitors. Since A&P had to deliver to its own store doors from the warehouses it maintained, it was unable to get the full benefit of its warehousing policy if the suppliers continued the store door deliveries. A&P forced some manufacturers to "widen the spread" between store door deliveries and warehouse deliveries and thus perpetuated its purchasing advantage. Also, it forced other suppliers to discontinue merchandising by aid of premiums given the customers. A&P did

---

[2] Great Atlantic & Pacific Tea Co. v. Federal Trade Comm., 3 Cir., 106 F.2d 667.

not want to be bothered with the premium details, and it did not want its competitors to have the advantage thereof, so it forced many suppliers to give up the premium aid to merchandising.

To do their buying of fruits, vegetables, and produce, A&P set up a wholly-owned subsidiary, the Atlantic Commission Company, herein referred to as ACCO. It acted as buyer for A&P and selling and buying broker for the rest of the trade, and for this latter service, ACCO received the usual broker's fees which went into the pocket of A&P since the latter was the sole owner of ACCO. ACCO was the largest single operator in its field. For a time it took brokerage from the seller for the merchandise it sold to A&P. These funds went, of course, to A&P. That system was abandoned. But the technique used by A&P in the purchase of merchandise other than fresh fruits, vegetables, and produce, in order to receive preferential treatment as to price, was used by ACCO in its field and with like success. And due to the fact that ACCO was dealing in perishable products, it used other techniques as well.

One of them was termed cash buying. Cash was paid at point of shipment. Such buying was always on a lower basis than term buying because cash buyers put up the money at once and took the merchandise with full assumption of the risks thereafter, while term buyers paid on delivery and the risks up to that point were borne by the shipper. This term buying was at a higher rate. What A&P did through ACCO was to get the cash buying rate without assuming the risks between point of shipment and destination. Outside of paying cash for the merchandise, none of the other reasons for a lower price on cash sales was present, as the shipper had to guarantee the arrival at destination of the merchandise as U. S. #1 Grade. Purchases on this basis were not made by ACCO for buyers other than A&P.

Another advantage was obtained by A&P through ACCO's purchases of A&P's requirements on the "sales arrival" basis. Under this arrangement, ACCO did not obligate itself to purchase or to pay a stated price until the goods arrived at their destination. On arrival ACCO would wire the price offer to the shipper, on a take it or leave it basis. "Sales arrival" purchases were made when falling markets were anticipated and compelled the shipper to assume the risk of price change from date of shipment to date of arrival. If the market slumped in the meantime, A&P was protected and the shipper took the loss or had to look for another buyer. When the perishability of the product and costs of diversion to another market, when such diversion was necessary, are considered, the superiority of ACCO's and A&P's bargaining position against the shipper becomes apparent. ACCO's aggressiveness and insistence upon its prerogative to fix prices unilaterally are evidenced by a statement of the defendant Baum, an executive officer and director of ACCO:

" * * * it will be necessary for your shippers to accept the price we place on this merchandise at the time of arrival and discontinue this bartering over 5¢ differential and if the shippers find that this procedure is not in accordance with their ideas or they are not given a fair deal on the average over a period of time then of course it is their privilege to discontinue these arrival sales or price arrivals."

ACCO occupied the dual position of buyer for A&P and seller for the shipper This dual relationship was known to both parties. This may have been legal between ACCO and its client, but it was all to the advantage of A&P. Where ACCO acted as buyer for A&P, it might at the same time be acting as seller to the trade. In this kind of a transaction, ACCO had the opportunity to choose for A&P the choicest produce, and as buyer obtain the produce for A&P at the lowest price in the market. The balance, which might be and often was an inferior grade, it sold to the trade; and in selling this produce, it always got the highest price it could get in the market. Because of the preferential discounts which A&P enjoyed in this field, it got a lower price than others and a higher quality of merchandise. When ACCO purchased in the open market for A&P, even though it paid the market price, it always came out with an advantage, not only in the quality of merchandise

but in price. Suppose an item was selling in the market at 100. ACCO could buy it for A&P and have its choice of the quality at 95. The balance of the trade could buy at 100 and pay ACCO a 5% brokerage. Thus, the price to A&P was 95 and to A&P's competitors 105.

ACCO was able to sell carloads of produce to jobbers at the carload price, acting then as the jobber's buying broker, with an agreement that it might buy back less than carload lot shipments for A&P at the same price the jobber had paid for the carload. Thus, A&P got l.c.l. shipments at carload price, and the jobber passed on the loss to A&P's competitors in higher prices. ACCO had another arrangement whereby it disposed of carloads to jobbers, earning a brokerage thereby, and simultaneously repurchased l.c.l lots as buying agent for A&P. The sellers of the l.c.l. shipments were jobbers, including those who had originally procured the produce from ACCO. It was ACCO's established practice to give its l.c.l. business to jobbers who gave their carload business to A&P, price and quality being equal. This repurchase inducement was a very effective weapon in the hands of ACCO. It could be used to expand its carload business with jobbers almost at will, since the jobbers had to purchase from ACCO in order to hold its l.c.l. patronage. As indicative of the coercive power of ACCO in the trade, it was able in some instances to compel a jobber who had already bought a shipment through a broker and incurred or paid brokerage thereon, to buy it also through ACCO and pay it brokerage too. This brokerage, of course, went to A&P. This was the price sometimes exacted by ACCO for its goodwill, and the price was added to A&P's competitors' costs, and the brokerage went to A&P.

ACCO also sought to control some co-operatives by controlling their managers, and there is evidence that ACCO obtained and benefited from such control to some extent.

ACCO also took merchandise on consignment. It always had the advantage of choice as to whether it would take the shipment for A&P. If it took it for A&P, the preferential price was obtained be-cause it was A&P, and in its dual capacity of representing both buyer and seller, its conflicting obligations at least put ACCO in a position to favor A&P. If the consignment went to the trade, ACCO got a brokerage, and then representing only the seller, it is a safe inference that it got all it possibly could for the merchandise. The result was a top price for the merchandise, and brokerage which went to A&P.

From this evidence, we see that ACCO collected brokerage from the trade, which increased the price to A&P's competitors, and the brokerage went into A&P's coffers to increase its competitive advantage. Secondly, ACCO got the best quality for A&P and passed on the inferior to A&P's competitors and, of course, ACCO got preferential treatment as to prices under one scheme or another. ACCO's profits constituted 5.08% of A&P's total profit in 1939; 5.62% in 1940; and 7.16% in 1941.

Closely related to the policy and the purpose to establish a two-price level by the abuse of its power and position, A&P by the same methods forced its suppliers to give it advertising and space allowances that bore no relation to the cost of the service rendered in the matter of advertising or display of merchandise in A&P's stores. Indeed, the evidence showed that in many instances, if not uniformly, token performance was all that was rendered the suppliers who ostensibly were seeking point of sale advertising. For instance, newspaper space advertising allowances were contracted for, not alone at the cost of the advertising but at the cost plus one hundred per cent to A&P. In its contracts with suppliers, A&P would contract for a percentage allowance and agree in the vaguest terms that it would display the suppliers' products on the shelves in just such fashion as it would ordinarily be expected to display the goods in the usual course of merchandising. For this pretended and overpaid service, certain percentage allowances on the commodity price were allowed A&P. It was its policy, and a usually successful one, to get a larger allowance of this kind than its competitors. If it did not get the allowance it sought, the threats to take away the business of

A&P were used and brought the supplier into line with one notable exception—the soap manufacturers. Procter & Gamble, Lever Bros., and Colgate Palmolive Peet Co. gave no more advantage to A&P than to other customers by way of advertising and display allowances. A&P expressed its displeasure at the policy of the soap manufacturers, but their position in the trade was invulnerable to A&P's policy. A&P's general policy of obtaining an advantage is highlighted by this failure in the soap industry. The profits from these allowances were substantial and amounted in 1939 to 5.93% of A&P's total profit; in 1940 to 6.23%; and in 1941 to 5.46%.

Another but smaller item was the bag and label allowances. A&P furnished bags and labels to processors and manufacturers, for which it received an allowance. For instance, in the canning industry, the standard allowance for labels was $1.50 per thousand, but A&P insisted upon and received $2 per thousand. It was claimed that A&P's labels were more attractive and expensive. However that may be, the fact remains that A&P was not in the label business any more than it was in the advertising business, but it managed in both to realize a substantial difference between the cost to it and what it realized out of the transaction from other suppliers. Everything was grist to the mill that was grinding down prices to A&P to enable it to maintain the two-price level to its advantage. The bag and label allowances amounted in 1939 to .83% of the total profit of A&P; in 1940 to .75%; and in 1941 to .38%.

As we have indicated, A&P owned and controlled, through the vertical integration of its system, certain corporations that were engaged in the manufacturing and processing of merchandise for sale by A&P in its stores. For instance, the defendant The Quaker Maid Company, Inc., made many items sold in A&P retail stores. The defendant White House Milk Company, Inc., manufactured canned milk. The defendant Nakat Packing Corporation canned fish. These companies were satellites of the A&P system. Their products were sold only to A&P stores and were invoiced at a markup above the cost of production. These corporations were tools in the hands of A&P, used and useful in maintaining the two-price level to enable it to maintain its position of dominance in the retail food business. Whatever the spread between cost to these defendants in processing and manufacturing and what they invoiced the goods to A&P for, was credited on the books to A&P. This, of course, was a bookkeeping transaction between A&P and its satellites and was a paper profit which eventually went to reduce the cost of the products to the retail stores when allocated to their credit on a fair method of allocation based upon use employed by the retail stores. In fact, all the paper profits of these manufacturing and processing satellites, together with the real profits of ACCO, the preferential discounts and buying allowances, the advertising allowances, the bag and label allowances, and certain other profits and gains throughout the system, were all kept track of by a system of what the defendants designate statistical accounting, for their own guidance to enable them to determine what the satellites, departments within the system as well as the retail stores, were doing. These accumulated profits and allowances at headquarters amounted in 1939 to 93.69% of A&P's total profits; in 1940 to 90.63%; and in 1941 to 89.02%. The difference between these accumulated profits and allowances and the total profits left the profits shown by the retail stores to be 6.31% in 1939; 9.37% in 1940; and 10.98% in 1941.

No question is raised about the fairness of the method of allocation of the accumulated profits and allowances. When made, they have the effect of reducing to the retail stores the cost of merchandise sold. It is the predatory method through which this accumulation of profits and allowances is obtained and not the method of allocation or statistical handling of them that is challenged by the Government. With this large fund accumulated at the buying and supplying level and allocated to the advantage of low cost of merchandise to the retail or selling level, A&P's enormous power or advantage over competitors emerges more clearly when we consider the evidence on the retail level. Here the price

advantage A&P has enjoyed through the coercive use of its power enables it to undersell its competitors and to pick and choose the locations in which the price advantage shall be used. For instance, if a division, unit, or store is selected for attention, whether on the basis of its experience historically in that community or some other basis sufficient to the policy makers of A&P, these policy makers have only to give their attention to gross profit percentages. If Area X is having a tough experience competitionwise, or the area looks prospective in which to increase the volume of business, the gross profit percentage in this area is lowered. This lowers the price at which goods may be sold and the volume increases at the expense of somebody. Sometimes the gross profit rate is fixed so low that the store runs below the cost of operation, even with all the advantage derived by the store in reduction of the cost of its merchandise occasioned by the headquarters' allocation of its predatory profits and accumulations. When the gross profit rate is reduced in Area X, it is an almost irresistible conclusion that A&P had the power to compensate for any possible decline in net profits by raising the gross profit rate and retail prices in Area Y, where it was in a competitive position to do so. The record is replete with instances of deliberate reductions of gross profit rates in selected areas. Thus Area Y, at the desire of the policy makers of A&P, can be brought to aid in the struggle in Area X, which in numerous instances, as the record shows, sustained heavy net losses for periods extending over a substantial number of consecutive years. There must inevitably be a compensation somewhere in the system for a loss somewhere else, as the overall policy of the company is to earn $7 per share per annum on its stock.

On this record it seems apparent that the goal of the conspiracy to establish a two-price level at the buying level, which enables A&P to meet its competitors with an enormous advantage at the retail level, has been realized.

■ When Congress enacted the Sherman Act it did not undertake to regulate business in commerce, which so often leads to price or rate fixing. Just a few years before the Sherman Act was enacted, Congress passed the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., whereby it did fix rates through an instrumentality of its own creation and within limits which Congress prescribed. The Sherman Act sought to avoid, not only for reasons of policy but for considerations of power, any regulation of business not in the category with railroads, which were supposed to be affected with the public interest, and to establish a punitive or corrective system for other business in commerce. Congress evidently believed that if competition were preserved in this field, free enterprise would regulate itself. The purpose of Congress was to see to it that competition was not destroyed. To this end, in the most comprehensive and sensitive terms, Congress provided among other things that a conspiracy to restrain trade in commerce and to monopolize it in part should be a criminal offense. That is the offense of which these defendants stand convicted.

■■ No court has yet said that the accumulation and use of great power is unlawful per se. Bigness is no crime, although "size is itelf an earmark of monopoly power. For size carries with it an opportunity for abuse." United States v. Paramount Pictures, 334 U.S. 131, 174, 68 S.Ct. 915, 937, 92 L.Ed. 1260. That there was an accumulation of great power by A&P cannot be denied. How it used that power is the question. When A&P did not get the preferential discount or allowance it demanded, it did not simply exercise its right to refuse to contract with the supplier. It went further and served notice on the supplier that if that supplier did not meet the price dictated by A&P, not only would the supplier lose the business at the moment under negotiation, but it would be put upon the unsatisfactory list or private blacklist of A&P and could expect no more business from the latter. This was a boycott and in and of itself is a violation of the Sherman Act. Schine Chain Theatres v. United States, 334 U.S. 110, 116, 68 S.Ct. 947, 92 L.Ed. ——; United States v. Griffith, 334 U.S. 100, 108, 109, 68 S.Ct. 941, 92 L.Ed. ——; Fashion Originators Guild v. Federal Trade Comm.,

312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949; Binderup v. Pathé Exchange, 263 U.S. 291, 311, 44 S.Ct. 96, 68 L.Ed. 308.

■ While it is not necessary to constitute a violation of Sections 1 and 2 of the Sherman Act that a showing be made that competitors were excluded by the use of monopoly power, American Tobacco Co. v. United States, supra, 328 U.S., at page 809, 66 S.Ct. 1125, 90 L.Ed. 1575, there is evidence in this record of how some local grocers were quickly eliminated under the lethal competition put upon them by A&P when armed with its monopoly power. As the evidence showed in this case, A&P received quantity discounts that bore no relation to any cost savings to the supplier. While A&P tried to rig up various contracts with its suppliers that would give the suppliers a semblance of compliance with the Robinson-Patman Act, by colorably relating the discriminatory preferences allowed to cost savings, the primary consideration with A&P seemed to be to get the discounts, lawfully, if possible, but to get them at all events. The conclusion is inescapable on this record that A&P was encouraging its suppliers to violate the Robinson-Patman Act. The unlawful discounts were to be received by A&P as its due, regardless. Whether or not A&P in inducing and knowingly receiving these price discriminations was in violation of the Robinson-Patman Act, as its suppliers certainly were, the advantage which A&P thereby obtained from its competitors is an unlawful restraint in itself. United States v. Paramount Pictures, supra, 334 U.S. at pages 159, 160, 68 S.Ct. 915. The purpose of these unlawful preferences and advantages was to carry out the avowed policy of A&P to maintain this two-price level which could not help but restrain trade and tend toward monopoly. Furthermore, to obtain these preferences, pressure was put on suppliers not by the use but by the abuse of A&P's tremendous buying power. The means as well as the end were unlawful. United States v. Griffith, supra, 334 U.S. at pages 104–107, 68 S.Ct. 941; Schine Chain Theatres v. United States, supra, 334 U.S. at pages 117, 118, 68 S.Ct. 947. With the concessions on the buying level acquired by the predatory application of its massed purchasing power, A&P was enabled to pressure its competitors on the selling level even to the extent of selling below cost and making up the loss in areas where competitive conditions were more favorable. The inevitable consequence of this whole business pattern is to create a chain reaction of ever-increasing selling volume and ever-increasing requirements and hence purchasing power for A&P, and for its competitors hardships not produced by competitive forces, and, conceivably, ultimate extinction. Under all the cases, this is a result which Sections 1 and 2 of the Sherman Act were designed to circumvent.

■ The individual defendants are so high in the hierarchy of the A&P system that the policy of A&P, that is, the conspiracy here charged, was fully and well known to all of them, and they cooperated with each other and with the satellite corporations in carrying out the policy. The satellite corporations were officered and controlled by interlocking directorates composed largely of these individual defendants. What these individuals knew and did, their corporations knew and did. Satellites like The Quaker Maid Company, Inc., Nakat Packing Corporation, and White House Milk Company, Inc., were mere puppets of the individual defendants. The individual defendants were the corporations, and the corporations were in a very real sense the individuals. One cannot disassociate the corporations from the individual defendants, who largely made up the interlocking directorates. These corporate satellites were a part and parcel of the economic power wielded by the other defendants to further the cause of the conspiracy. Their activities considered in vacuo, if possible, may not be unlawful in themselves, but when used to further the conspiracy become illegal. American Tobacco Co. v. United States, supra, 328 U.S. at page 809, 66 S.Ct. 1125, 90 L.Ed. 1575; Bigelow v. R. K. O. Radio Pictures, 7 Cir., 162 F.2d 520, 523. See White Bear Theatre Corp. v. State Theatre Corp., 8 Cir., 129 F.2d 600.

■ We turn now to the defendants' contention concerning certain evidence offered by the defendants and excluded by

the District Court. The defendants offered evidence that it was the custom in the trade for retailers to seek and suppliers to offer the same type of concessions obtained by the defendants, without attempting to show that the circumstances and methods by which these concessions were obtained were the same. The court did not err in excluding this proffered evidence. That others engaged in the same practices as the defendants certainly would not exonerate the defendants or tend to disprove their guilt. Cetainly trade customs and practices not shown to have been practiced in the same manner as the defendants were shown to have practiced them would not be competent to show that the defendants' practices were not illegal. United States v. General Motors Corporation, 7 Cir., 121 F.2d 376, 406; Hills Bros. v. Federal Trade Commission, 9 Cir., 9 F.2d 481, 484, 485.

■ The District Court also excluded evidence of the defendants' attempts to comply with the Robinson-Patman Act and with the cease and desist order of the Federal Trade Commission.[3] There are several reasons why this evidence was properly rejected. In the first place, the defendants were not charged here with the violation of either the Robinson-Patman Act or the cease and desist order. The charges against the defendants were not met by showing good faith attempts to comply with other laws. Secondly, the evidence was only cumulative, as the record is replete with admitted evidence of like kind which the defendants were permitted to introduce on the issue of whether the defendants had forced preferential concessions, and whether in the dealings of ACCO the defendants were treated like others. Furthermore, the evidence offered and rejected attempted to show compliance with the Robinson-Patman Act and the cease and desist order by statements of some of the defendants as to how they had intended and endeavored to obey the same. As such, they were merely self-serving declarations, and for this reason no error was committed in excluding them. American Tobacco Co. v. United States, 6 Cir., 147 F.2d 93, 120, affirmed 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575.

■ At best, these were offers to prove collateral matters, and the trial court, as to these, had a broad discretion. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 230, 231, 60 S.Ct. 811, 84 L.Ed. 1129. There is no showing here of an abuse of discretion by the District Court. We could hardly imagine such a showing being made when we consider the wide range the evidence was permitted to take in this trial, which consumed several months. The objection to the exclusion of collateral issues "is a purely practical one,—a concession to the shortness of life." [4]

We turn, finally, to the contention of the defendants Byoir and Business Organization, Inc., that there is no substantial evidence that they were parties to and furthered the illegal objectives of A&P's overall conspiracy to restrain and monopolize trade in commerce. These two defendants are dealt with together, for there is no question that Business Organization, Inc., which was organized to promote the public relations of A&P, was Byoir's alter ego, Byoir in the habiliments of the corporate fiction, and chargeable with Byoir's words and deeds.

The evidence shows that Byoir was thoroughly familiar with the policies of A&P. Byoir is no babe in the woods, likely not to understand what goes on around him. Not only did he understand, but under the contract of his corporate puppet with A&P it was his duty to counsel, guide, and direct the policy making officers of his client. This obligation he faithfully performed even to the extent of initiating policy and personally participating in its adoption and implementation. The most glaring instance of this disclosed in the record is Byoir's role in the organization and direction during its brief life of Super-Coop, a cooperative of growers and shippers of fresh fruits and vegetables.

It will serve no good purpose to describe the origin and operation of Super-Coop. Suffice it to say that it was formed to secure a larger and more effective control of

---

[3] Great Atlantic & Pacific Tea Co. v. Federal Trade Comm., supra, note 2.

[4] Justice Holmes in Reeve v. Dennett, 145 Mass. 23, 28, 11 N.E. 938, 944.

the shippers by ACCO, A&P's operator in the fruit and vegetable field. From this control ACCO was to benefit in the form of a lower expense rate resulting from the larger volume handled, a greater availability in quantity and selection of supplies for A&P, and an organization readily useful as a propaganda agency to fight A&P's enemies; while the shippers were to receive as their quid pro quo a share of ACCO's profits. The founding fathers of the plan were ACCO's Baum, Byoir, and John Hartford, although when Hartford expressed doubt as to its legality, it was camouflaged to make it appear as though the shippers were the moving force in the organization. There can be no doubt that ACCO actively promoted and launched Super-Coop, and that Byoir's skillful hand was always present and directing. It was Byoir who expressed willingness to assist financially in setting it up; who attempted to secure the Department of Agriculture's approval thereof; who sought to disguise ACCO's sponsorship; and who authored a statement of its policy. Stripped of all non-essentials, Super-Coop is revealed as an attempt by ACCO to induce the movement of all fruits and vegetables through it. It was abandoned by ACCO precisely because of the fear that it was too apparent an attempt to monopolize the fresh fruit and vegetable industry. There can be no doubt on this record that the defendant Byoir had full knowledge of the monopolistic purpose of Super-Coop and of A&P's overall conspiracy which it was intended to further, and such knowledge notwithstanding, took a large personal part in its formation and development.

The defendant Byoir argues that even if the conspiracy did exist, which he does not admit, that he did not become a member of it by rendering services to the conspirators, citing Di Bonaventura v. United States, 4 Cir., 15 F.2d 494; United States v. Dellaro, 2 Cir., 99 F.2d 781; United States v. Dubrin, 2 Cir., 93 F.2d 499; and United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128. These authorities indicate the rule to be as the defendant Byoir contends, but the rule is against the defendant Byoir if he knew of the conspiracy. Of course, there is no direct evidence that Byoir knew of the conspiracy. There was no formal agreement. The conspiracy is spelled out by what the defendants said and did. But it is a fairly conclusive inference from the evidence in this record that Byoir, who testified he was familiar with A&P's policies, could not have been ignorant of the thread of this conspiracy, which runs through the whole fabric of A&P's dealings, especially when consideration is given to Byoir's damaging participation in the direction of and his cooperation with ACCO in setting up Super-Coop. We think the evidence and the reasonable inferences to be drawn therefrom are sufficient to show that Byoir and Business Organization, Inc., with knowledge of the conspiracy, cooperated to further it.

On the whole record, we think that there is substantial evidence to support the finding as to the guilt of all the defendants. The other errors complained of have all been considered and found unsubstantial, and the judgment is affirmed.