**PALMER NEWS, INC., et al., Plaintiffs,**

v.

**ARA SERVICES, INC., et al., Defendants.**

No. 75–254–C5.

United States District Court, D. Kansas.

Aug. 16, 1979.

Charles M. Waygood, Erica B. Baird, and Peter Aron of Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, and Charles D. McAtee of Eidson, Lewis, Porter & Haynes, Topeka, Kan., for plaintiffs.

John C. Noonan of Stinson, Mag & Fizzell, Kansas City, Mo., William J. Kolasky, Jr., James S. Campbell, and Nancy C. Garrison of Wilmer, Cutler & Pickering, Washington, D. C., and Michael J. Grady of Cosgrove, Webb & Oman, Topeka, Kan., for defendants ARA Services, Inc., et al.

Stuart H. Savett of Kohn, Savett, Marion & Graf, Philadelphia, Pa., for defendant Curtis Circulation Co.

Irving Scher of Weil, Gotschal & Manges, New York City, and John Stumbo of Stumbo, Stumbo, Palmer, McAllister & Buening, Topeka, Kan., for defendant Independent News Co., Inc.

Allan M. Pepper of Kaye, Scholer, Fierman, Hays & Handler, J. Michael Frascati of Lipton, Wasserstrom & DeGroot, New York City, for defendant International Circulation Distributors.

Gerald L. Goodell of Goodell, Stratton, Edmonds, Palmer & Wright, Topeka, Kan., for defendants Curtis Circulation Co. and International Circulation Distributors.

Vernon E. Vig and John W. Wall of Donovan, Leisure, Newton & Irvine, New York City, George A. Lowe of Lowe, Terry & Roberts, Olathe, Kan., for defendant Kable News Co.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

### INTRODUCTION

This is a major antitrust action which could have a significant impact upon the industry which distributes periodicals and paperback books in this country. The distribution industry may be viewed as a ladder. The top rung consists of the publishers. The next lower rung is composed of the national distributors. Beneath the national distributors are the wholesalers, then the retailers, and finally the consumers.

Plaintiffs in this action are Palmer News, Inc., and related companies (hereinafter referred to as "Palmer" or "the Palmer combine"). The Palmer combine is a major wholesaler in the Midwest and Southwest.

One group of defendants is composed of ARA Services, Inc., and some of its related companies (hereinafter referred to as "ARA" or "the ARA complex"). The ARA complex is the nation's largest wholesaler, with agencies throughout the United States.

The other group of defendants is composed of the national distributors. When this action was filed, eleven national distributors were defendants. Seven of the national distributors have reached settlements with Palmer, and have been dismissed from the action. The remaining national distributor defendants are Curtis Circulation Company, International Circulation Distributors, Kable News Company, and Independent News Company.

This action was filed in late 1975, and plaintiffs now proceed upon an amended complaint (filed September 29, 1976) and a supplemental claim (filed July 17, 1978). Plaintiffs now pursue seven antitrust counts.

This case comes before the Court upon the distributor defendants' motion for partial summary judgment as to Counts IV and VII, and upon ARA's motion for partial

summary judgment as to Count V. Count IV alleges that the distributor defendants have violated the Robinson-Patman Act, specifically, 15 U.S.C. § 13(a), (d), and (e). Count V alleges that ARA has also violated the Robinson-Patman Act, 15 U.S.C. § 13(f). Count VII alleges, in relevant part, that the distributor defendants have violated § 7 of the Clayton Act, 15 U.S.C. § 18. Because of the similarity of subject matter, we shall discuss Counts IV and V together. Then, we shall discuss Count VII.

*Standard for Judgment on the Pleadings.*

As indicated, this action comes before the Court upon various motions for judgment on the pleadings, pursuant to F.R.Civ.P. 12(c). The parties are not in dispute as to the proper standard to apply in evaluating such motions. One treatise notes:

> The federal courts have followed a fairly restrictive standard in ruling on motions for judgment on the pleadings. Although the motion may be helpful in disposing of cases in which there is no substantive dispute that warrants proceeding further, thereby easing crowded trial dockets, hasty or imprudent use of this summary procedure by the courts violates the policy in favor of ensuring to each litigant a full and fair hearing on the merits of his claim or defense. The importance of this policy has made federal judges unwilling to grant a motion under Rule 12(c) unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law. In considering a motion for judgment on the pleadings, the trial court is required to view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. In this fashion the courts hope to insure that the rights of the nonmoving party are decided as fully and fairly on a Rule 12(c) motion, as if there had been a trial.

> For purposes of the court's consideration of the motion, all of the well pleaded factual allegations in the adversary's pleadings are assumed to be true and all contravening assertions in the movant's pleadings are taken to be false. [5 C. Wright & A. Miller, Federal Practice and Procedure: Civil, § 1368, pp. 689–691 (1969)]

## THE COMPLAINT

To aid a thorough understanding of the issues presented, we begin by summarizing the relevant portions of the plaintiffs' complaint.

*The Fourth Cause of Action*

Plaintiff's fourth cause of action is found at ¶ 68 and p. 18 of their amended complaint.

In ¶ 68, plaintiffs reallege certain earlier paragraphs, 1–23 (description of the parties), 26–30 (description of the operation of the periodicals distribution industry), and 43. ¶ 43 alleges that by virtue of its enormous size and market power, the ARA complex possesses enormous purchasing power in its negotiations and transactions with the national distributors. It is further alleged that in negotiating, ARA effectively combines its purchases for those markets in which it contains great market power with its purchases for those markets in which it does not possess such power.

¶ 69 alleges that Palmer and ARA are each customers of the distributor defendants.

¶ 70 states that Palmer and the ARA complex are "engaged in competition" in the areas in and around the cities of Topeka, Wichita, and Kansas City, Kansas, in numerous towns in all but the southwest quarter of the State of Kansas, and in the area surrounding St. Joseph, Missouri, and in the area surrounding Tucson, Arizona, in various towns in Western Arizona, and in various towns in Southern Nebraska.

¶ 71 alleges that the distributors know of this competition.

¶ 72 alleges that despite their knowledge, the distributors have directly and indirectly discriminated against Palmer in price, payment of allowances and provision of services for, and in connection with the sale of,

publications of like grade and quality, including identical publications.

¶ 73 explains that periodicals and paperbacks are sold to the public on basis of "cover price" and that "prices" to wholesalers are measured in terms of "discounts" off the cover price.

¶ 74 says that prices are set by the national distributors, with such prices being negotiated separately between each distributor and each wholesaler, and that the term "price" includes not only the "discount" but also the granting of options or return privileges, payment of distribution allowances and cash rebates, the provision of free merchandise, etc.

¶ 75 alleges that the individual national distributor defendants have: (a) sold paperbacks to the ARA complex at discounts up to 12% better than those given Palmer; (b) granted to ARA, but not Palmer (or if so in a lesser degree) special credits including distribution allowances, return allowances, warehouse allowances, inventory allowances, advertising allowances, incentive bonuses and operational subsidies; (c) accorded ARA, but not Palmer, valuable special privileges, including delayed billing, the right to accept or reject specific titles of paperbacks, the right to set "draws" of various publications and the right to process returns by affidavit rather than by sorting, stripping and shipping covers; (d) forced Palmer, but not ARA, to accept large quantities of certain specialty publications bearing high cover prices, to pay for such publications shortly after receipt and to refrain from returning large unsold quantities for up to 6-9 months; (e) unreasonably cut back Palmer's, but not ARA's allotment of magazine titles most in demand by retailers; (f) granted to the ARA complex, but not to Palmer, the right to return publications beyond the date specified for their return; and (g) provided ARA, but not Palmer gratis services including the provision of full-time "distribution clerks" to supervise the allocation of magazines to retailer customers, and causing said national distributors' traveling representatives to visit the establishments of retailers customers and re-arrange and otherwise maintain the displays found therein.

¶ 76 alleges that the effect of these preferences has enabled ARA to offer substantially lower prices and terms of sale and more costly and extensive services to retail customers within Palmer's "areas of operations" than Palmer is economically capable of offering.

¶ 77 alleges that the effect of these discriminatory prices and allowances has been or may be to substantially lessen competition and tend to create a monopoly in Palmer's areas of operations by denying Palmer the opportunity to compete on equal terms with the ARA complex.

¶ 78 states that this discrimination constitutes a violation of Sections 2(a), (d), and (e) of the Robinson-Patman Act, 15 U.S.C. §§ 13(a), (d), and (e).

¶ 79 alleges damages of not less than $2,000,000.

¶ 80 requests injunctive relief.

*The Fifth Cause of Action*

Plaintiffs' fifth cause of action is found at ¶ 81 and p. 22 of their amended complaint.

In ¶ 81, plaintiffs reallege certain earlier paragraphs, including 1-11 (description of the parties), 26-29 (description of the operation of the periodicals distribution industry), 36-40 (description of the markets in which the plaintiff agencies compete), and 43.

In ¶ 82, it is alleged that ARA, utilizing its enormous purchasing power, has induced and received the unlawful direct and indirect discriminatory prices described in ¶ 73-76.

¶ 83 alleges that ARA knew and knows that the prices it receives from the distributors are substantially better than those afforded Palmer.

¶ 84 claims that this knowing inducement and receipt of unlawfully discriminatory prices and terms of sale violates 15 U.S.C. § 13(f).

¶ 85 alleges damages in an undetermined amount.

¶ 86 requests injunctive relief.

## THE STATUTES

The Robinson-Patman Act was signed into law on June 19, 1936, as an amendment to Section 2 of the Clayton Act. H. Shniderman, Price Discrimination in Perspective 4 (1977). It is generally agreed that the primary purpose of the amendment

. . . was the protection of the smaller independent merchants from injury to their competitive position resulting from discriminatory advantages extended by manufacturers and producers to mass distributors who were using their concentrated buying power to demand and obtain price concessions and preferential allowances and services. Whereas Section 2 of the original Clayton Act was aimed at predatory practices of powerful sellers directed at elimination of *their* weaker competitors, the Robinson-Patman Act was designed to curb the predatory use of bargaining power by chain stores and other large *buyers* and to preserve the independence of the small merchant as a factor in his local community. [C. Austin, Price Discrimination 11 (1959)]

*See also Abbott Laboratories v. Portland Retail Druggists, Assn., Inc.,* 425 U.S. 1, 11–12, 96 S.Ct. 1305, 47 L.Ed.2d 537 (1976); *F.T.C. v. Morton Salt Co.,* 334 U.S. 37, 43, 68 S.Ct. 822, 92 L.Ed. 1196 (1948); *Purex Corp., Ltd.,* 51 F.T.C. 100, 111 (1954).

15 U.S.C. § 13(a) states, in pertinent part, that

[i]t shall be unlawful for any person engaged in commerce, . . . either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

It should be noted that § 13(a) provides for what is known as a "cost justification defense", and § 13(b) provides for a "meeting competition defense."

15 U.S.C. § 13(d) and (e) prohibit forms of non-price discrimination by proscribing, respectively

. . . the granting of allowances for services or facilities provided by the purchaser, or the furnishing of any services or facilities involved in the processing or handling of the commodity in question, unless such concessions have been accorded "to all purchasers on proportionally equal terms." Unlike Section 2(a) [15 U.S.C. § 13(a)], these sections require no showing of injury to competition. Moreover, defenses to a violation of these sections are limited. [Department of Justice, Report on the Robinson-Patman Act 3 (1977)]

Finally, 15 U.S.C. § 13(f) is aimed at the *buyer*, rather than the seller, stating that

. . . [i]t shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section.

Although it is perhaps aimed primarily at the buyer level of competition, the Robinson-Patman Act's proscription against price discrimination has been applied to at least four levels of competition, as pointed out in 16A J. Von Kalinowski, Business Organizations: Antitrust Laws and Trade Regulation § 28.01, p. 28–5 (1976):

Thus, the statute recognizes not only three types of injury to competition, but also three different distributive levels of competition at which the prohibited injury may occur:

(1) the primary or seller's level ("primary line" injury)—competitive injury to competitors of the seller;

(2) the secondary or buyer's level ("secondary line" injury)—competitive injury to competitors of a "favored" purchaser;

(3) the third or tertiary level of customers of the buyer ("third or tertiary line" injury)—competitive injury to competitors of the customer of a "favored" purchaser.

Additionally, the Supreme Court, in a case of first impression [*Perkins v. Standard Oil Co.*, 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969)], has recognized a fourth level of competitive injury—the level of customers of customers of the "favored" buyer.

Because plaintiffs claim that they are competitors of ARA, an allegedly "favored" purchaser from the national distributors, we are dealing with a classic "secondary line" case under the Robinson-Patman Act.

### Count V Dependent on Count IV

As noted, Count IV of the plaintiffs' amended complaint alleges that the national distributors have violated 15 U.S.C. § 13(a), (d), and (e) by giving discriminatorily favorable prices and terms to ARA. Count V alleges that by eliciting and accepting these favorable prices and terms, ARA has violated 15 U.S.C. § 13(f). Our discussion of the merits of the Robinson-Patman Act will concentrate on Count IV for the simple reason that a finding of ARA's liability under § 13(f) is dependent upon a finding of the national distributors' liability under § 13(a). This connection was made extremely clear by the United States Supreme Court in *Great A & P Tea Co. v. F.T.C.*, 440 U.S. 69, 76–77, 99 S.Ct. 925, 931, 59 L.Ed.2d 925 (1979):

> Liability under § 2(f) thus is limited to situations where the price discrimination is one "which is prohibited by this section." While the phrase "this section" refers to the entire § 2 of the Act, only subsections (a) and (b) dealing with seller liability involve discriminations in price. Under the plain meaning of § 2(f), therefore, a buyer cannot be liable if a prima facie case could not be established against a seller or if the seller has an affirmative defense. In either situation, there is no price discrimination "prohibited by this section." The legislative history of § 2(f) fully confirms the conclusion that buyer liability under § 2(f) is dependent on seller liability under § 2(a).

The derivative nature of liability under § 2(f) was recognized by this Court in *Automatic Canteen Co. of America v. FTC*, 346 U.S. 61 [73 S.Ct. 1017, 97 L.Ed. 1454.] In that case, the Court stated that even if the Commission has established a prima facie case of price discrimination, a buyer does not violate § 2(f) if the lower prices received are either within one of the seller's defenses or not known by him not to be within one of those defenses.

Thus, if we conclude that plaintiffs have failed to plead a prima facie case under 15 U.S.C. § 13(a), we must also conclude that plaintiffs have failed to make out a prima facie case under 15 U.S.C. § 13(f) in Count V. On the other hand, if we conclude that plaintiffs have adequately alleged a § 13(a) claim in Count IV, then we have no basis for granting ARA judgment as to Count V at this stage of the proceedings.

### Discussion of Count IV

The specific allegations regarding Count IV have been summarized above. In response to these motions, plaintiffs have clarified their claims to a great extent. Plaintiffs' briefs claim that their discovery indicates that price discrimination by the national distributors in favor of ARA takes at least three different forms. Plaintiffs have categorized these various forms of discrimination into three "sets of facts" which illustrate the Robinson-Patman violations claimed in Counts IV and V. The Court will evaluate each of these "sets of facts" separately.

> *Set of Facts # 1*—Direct, Outright Discrimination In the Sale of Publications to ARA for Resale by "Nearby" Units.

The plaintiffs first claim that their discovery has shown that the national distributors have given discriminatorily favorable terms and conditions to ARA agencies which compete directly with Palmer agencies in the Midwest. Four instances are alleged. First, an ARA Midwest unit is billed a certain percentage discount off net magazine sales unavailable to the plaintiff operating in the same area. Second, all of ARA's "nearby" [*i. e.*, competing in the same markets as Palmer] units were granted a certain percentage discount off net magazine sales plus per-copy allowances,

also unavailable to plaintiffs. *See F.T.C. v. Ruberoid Co.*, 343 U.S. 470, 72 S.Ct. 800, 96 L.Ed. 1081 (1952). Third, a "nearby" ARA agency has been provided personnel by a distributor to assist in soliciting customers and performing other wholesaling functions, where no such personnel have been provided to Palmer in the same area. *See Sun Cosmetic Shoppe v. Elizabeth Arden Sales Corp.*, 178 F.2d 150 (2d Cir. 1949). Finally, distributors have made timely deliveries to ARA while dragging out deliveries to Palmer in the same area. *See Centex-Winston Corp. v. Edward Hines Lumber Co.*, 447 F.2d 585 (7th Cir. 1971), *cert. denied*, 405 U.S. 921, 92 S.Ct. 956, 30 L.Ed.2d 791 (1972).

■ Movants do not claim that the instances of discrimination which have just been outlined would not adequately state violations of 15 U.S.C. § 13. It is clear that such examples constitute classic instances of "secondary line" Robinson-Patman claims. Rather, movants claim that plaintiffs' Count IV, in movants' view, is carefully worded so as to avoid making a claim of "direct" discrimination. Further, movants argue that plaintiffs' counsel specifically disclaimed an allegation of "direct" discrimination at the March 9, 1979, pretrial conference when he stated:

Mr. Waygood: "Compared to what ARA is paying in the Midwest, in most instances, with respect to national distributors, there is no difference, which is consistent, your Honor, with what we allege in the Complaint." [Tr. at 104]

We must reject movants' arguments. Mr. Waygood's statements, made on behalf of plaintiffs, that "in most instances" ARA and Palmer are paying the same prices in the Midwest, should not be read as disclaiming *any* cause of action based on examples of "direct" discrimination. The Court understood these comments only to indicate that plaintiffs' discovery relative to "direct" discrimination had been relatively unfruitful and that the bulk of plaintiffs' reliance would be upon instances of "indirect" discrimination (which shall be discussed presently). We find no basis for applying an "estoppel" doctrine to prevent plaintiffs from proving at trial the instances of "direct" discrimination alleged in their latest briefs.

■ Neither do we accept movants' contention that the plaintiffs' complaint purposely avoided alleging "direct" discrimination as a basis for liability. The basis for movants' contention is the fact that Count IV alleged that the distributors discriminate in favor of the ARA complex, and omitted any allegation of discrimination in favor of a specific midwestern ARA agency which is in direct competition with a Palmer agency. If the complaint could be considered deficient in this respect, the Court would feel obligated, pursuant to F.R.Civ.P. 15(a) to allow an amendment which would permit plaintiffs to place into their Count IV allegations their more specific allegations describing the "three sets of facts" outlined above.

However, we do not believe that such an amendment is necessary. The elements of a 15 U.S.C. § 13(a) violation are well known:

To maintain an action under Section 13(a) the plaintiff must allege and prove, inter alia: (1) That the defendant is engaged in commerce; (2) that, in the course of such commerce, the defendant has discriminated in price between different purchasers of commodities of like grade and quality; (3) that 'either or any of the purchases involved in such discrimination are in commerce'; and (4) that there is likely to be a severe, adverse effect on competition. [*Cliff Foods Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 208 (5th Cir. 1969)]

*See also Hampton v. Graff Vending Co.*, 516 F.2d 100, 101–102 (5th Cir. 1975); W. Patman, Complete Guide to the Robinson-Patman Act 49 (1963).

Movants do not dispute that the complaint adequately sets forth these elements. Nor do movants dispute that the liberal pleading requirements of F.R.Civ.P. 8 apply here. The age of fact pleading is past; antitrust pleadings are to be construed liberally. *Quinonez v. Nat. Ass'n of Securities*

*Dealers, Inc.*, 540 F.2d 824 (5th Cir. 1976); *New Home Appliance Center v. Thompson*, 250 F.2d 881, 883 (10th Cir. 1957); *Material Handling Industries, Inc. v. Eaton Corp.*, 391 F.Supp. 977, 981 (E.D.Va.1975); *Allied Electric Supply Company v. Motorola, Inc.*, 369 F.Supp. 133, 135 (W.D.Pa.1973).

In short, movants are unable to cite the Court to authority indicating that the complaint should have contained the specific allegations which plaintiffs have now made in their three "sets of facts." As the Tenth Circuit stated in *New Home Appliance Center v. Thompson, supra,* 250 F.2d at 883, "it is not the office of a complaint to plead detailed facts *or state particular theories for recovery.*" (emphasis added) More recently, in *Eye Encounter, Inc. v. Contour Art, Ltd.*, 81 F.R.D. 683, 690 (E.D.N.Y.1979), the court stated:

> Defendants contest the sufficiency of plaintiff's assertion of a violation of § 2(a) of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a) on essentially two grounds. First, they contend vaguely that the complaint does not allege in detail the specifics of plaintiff's claim. As mentioned above, this is unnecessary. Plaintiff need only allege that a defendant who has engaged in commerce, has discriminated in price between purchasers of commodities, of like grade and quality, where the effect may be to substantially lessen competition. *John B. Hull, Inc. v. Waterbury Petroleum Products, Inc., supra,* 588 F.2d [24] at 27. The complaint does meet the bare minimum in setting forth such a claim. Moreover, any flaw in pleading in this situation would not warrant dismissal given the more than adequate notice provided by the complaint; expanded pleadings would add little to the notice already given. See *Donson Stores, Inc. v. American Bakeries Co.*, 58 F.R.D. 485, 488 (S.D.N.Y.1973).

In sum, we conclude that plaintiffs' Count IV is sufficient to state a violation of 13 U.S.C. § 13(a), even though it does not specifically spell out the discrimination between a given ARA agency and a Palmer agency competing in the same area. If this motion had been made earlier in the progress of the case, we would have felt constrained to deny it in order to allow plaintiffs to conduct further discovery. Now that such discovery has been conducted, if we felt the allegations of the complaint were inadequate (which we do not) we would feel constrained to allow an amendment to include the allegations of "direct" discrimination.

As noted above, movants do not contend that the instances of discrimination spelled out in plaintiffs' first "set of facts" do not constitute a Robinson-Patman violation. Rather, their attorneys argued at the most recent pretrial conference that should the court determine that the pleadings were adequate to state a claim for "direct" discrimination, the court should "so rule, and at least we will know what we are defending against." [Tr. p. 29] The Court has done so.

Our ruling as to plaintiffs' first "set of facts" mandates that defendants' motion for judgment on the pleadings as to Counts IV and V be denied. Therefore, the Court need not discuss the validity of plaintiffs' second and third "sets of facts". Nonetheless, the Court feels that the progression of this case toward trial would be materially advanced by an expression of our views concerning the legal viability of these two theories of liability. Therefore, we shall proceed to discuss them.

> *Set of Facts # 2*—Discrimination in Favor of ARA on Publications for Resale by "Nearby" Units Through, and Under Guise of, Prices and Terms to "Distant" Units.

◼ In their second theory for Robinson-Patman recovery, plaintiffs contend that the national distributor defendants have given price and other advantages to ARA units which compete directly with Palmer units, but have disguised those advantages through various bookkeeping maneuvers. We quote from plaintiffs' July 12 brief (Doc. # 710, pp. 14–15):

> Here's how it worked in one instance: Negotiating as one entity, ARA reached

agreement with a publisher of a tabloid distributed by a defendant for an overall, lump-sum "weekly transportation allowance" for ARA as a whole. ARA then determined and advised the publisher and distributor exactly how that lump-sum was to be allocated (*viz.*, among only six of ARA's agencies).

Another example: ARA and a distributor initially agreed that at the end of the calendar year, ARA would receive payment in an amount representing a certain percentage of each unit's (*i. e.*, both "competing" and "distant") net sales of a certain paperback book line. Subsequently, the form of the deal was changed. Credits of a certain percentage were issued by the distributor to about half the ARA units—with a bottom line about the same as if the initial form of the agreed-upon deal were followed.

Do these allegations constitute a Robinson-Patman violation? The Court believes that they do, for they claim that the national distributors are granting discriminatory favors to ARA units which compete directly with Palmer units, but are attempting to disguise those discriminations by bookkeeping methods which make it appear that the advantage is going to ARA units with which Palmer does not directly compete.

Our view is supported, we believe, by the mere existence of 15 U.S.C. § 13(d) and (e) which provide that sellers cannot disguise discriminations in favor of certain buyers by putting those discriminations into non-price forms. The legislative history of the Robinson-Patman Act indicates that such surreptitious attempts at destroying competition by disguise were contemplated, at least in a "primary line" situation:

This corporate chain desires to destroy the competitors around [its] thousand new stores. Under the existing system all they have to do is let these thousand stores have all their secret rebates obtained by reason of their purchases for all their 11,000 stores and this will enable the thousand new stores to soon destroy their competitors. When these competitors are destroyed, a thousand more stores can be opened and their competitors destroyed in a similar manner. The losses in one place are made up not only by the secret rebates obtained on total purchases but also on higher prices charged to consumers in areas where they already have a monopoly of business where their competitors have already folded up. [Department of Justice, Report on the Robinson-Patman Act, supra at pp. 125–126, quoting *Hearings on H.R. 8442, H.R. 4995, H.R. 5062 Before The Committee on The Judiciary of the House of Representatives* 5, 74th Cong., 1st Sess. (1935).]

The instances of disguised direct discriminations encompassed in plaintiffs' second "set of facts" violate the Robinson-Patman Act as surely as undisguised direct discriminations would. That a Robinson-Patman violation may not be avoided by disguising or mislabeling the action taken, is indicated in the opinion in *FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1027 (2d Cir. 1976), *cert. denied* 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977):

We do not suggest or imply that, if a manufacturer grants a price discount or allowance to its wholesalers (whether or not labelled "incentive"), which has the purpose or effect of defeating the objectives of the Act, § 2(a)'s language may not be construed to defeat it.

The actions outlined in plaintiffs' second "set of facts" have the effect of defeating the objectives of the Robinson-Patman Act.

We conclude that the plaintiffs' second theory of recovery is legally valid. Movants do not really dispute this conclusion. Rather, they argue that the theory of recovery is not included within the allegations of Count IV because Count IV did not reallege ¶ 45 of Count I of the complaint in which it is alleged that ARA and the national distributors have conspired and "attempted to create a facade" indicating that ARA and Palmer were doing business on the same terms when in fact ARA was receiving more favorable prices and terms from the national distributors.

Plaintiffs respond by arguing that a Robinson-Patman claim does not require an al-

legation of conspiracy, citing *Syracuse Broadcasting Corp. v. Newhouse*, 236 F.2d 522, 527 (2d Cir. 1956). Movants respond by pointing to language in *Abbott Laboratories, Inc. v. Portland Retail Druggists Ass'n, Inc., supra*, 425 U.S. at 20, 96 S.Ct. 1305, indicating that a supplier may escape liability by avoiding collusive behavior. It may be noted that the facts set forth in the second "set of facts" clearly indicate a collusion or conspiracy between ARA and the national distributors to disguise the true nature of the discriminations granted, thus satisfying even movants' view of the requirement.

We conclude that in light of the liberal policies embodied in F.R.Civ.P. 8, plaintiffs' allegations are adequate. Alternatively, as with the first "set of facts", were the allegations deemed inadequate we would be constrained to grant a proper amendment pursuant to F.R.Civ.P. 15. Plaintiffs' second theory of recovery is legally viable and properly alleged.

> *Set of Facts # 3*—"Interstate Underwriting" or "Corporate Treasury" Theory

It is in plaintiffs' third theory of recovery that the Court is presented with a most difficult legal question. Here, the movants do not deny that plaintiffs' complaint adequately alleges this theory of Robinson-Patman recovery. Rather, movants challenge the legal viability of this third "set of facts."

In essence, by their third theory of recovery, plaintiffs claim that the national distributors grant "favorable" prices and terms to ARA agencies which do not compete directly with Palmer agencies, and that ARA utilizes the profits which it obtains in those "distant" markets to underwrite below-cost competition in the markets where its agencies do compete with Palmer agencies. Plaintiffs term this their "interstate underwriting" theory. Defendants have dubbed it a "corporate treasury" theory of recovery.

Plaintiffs have presented one specific factual situation illustrating the theory:

A concrete example: Plaintiffs contend that the 7-Eleven chain agreed to switch its Midwest stores to ARA in exchange for, among other things, the agreement by ARA's Washington, D.C. unit to drop its service charge to the 7-Eleven stores in its area. It is the favored prices and terms at which distributors sell publications to ARA for resale by its Washington, D.C. unit, plaintiffs contend, that enabled that unit to make the attractive offer to its 7-Eleven stores, causing plaintiffs the loss of 7-Eleven business in the Midwest. [Plaintiffs' Memorandum, Doc. # 728, p. 20]

If plaintiffs proved the facts alleged, would a violation of the Robinson-Patman Act be shown? The question is difficult and unique. Although both plaintiffs and defendants believe that they have produced cases which directly support their arguments, the Court finds none of the cases cited to be directly on point or convincingly dispositive of the issue presented. Therefore, we believe we are being asked to break new ground in the interpretation of the Robinson-Patman Act, which is doubtless one of the most confusing antitrust laws on the books.

It is our ultimate conclusion that the plaintiffs' "interstate underwriting" theory is legally deficient in that it fails to meet two requirements of any Robinson-Patman "secondary line" violation. First, the theory does not meet the "competitive nexus" requirement. Second, the theory does not meet the "causal connection" requirement. These two elements of a "secondary line" claim will be discussed in turn.

*—Competitive Nexus.*

It is very well established that a buyer who claims a "secondary line" violation stemming from the granting by a seller of a better price to another buyer must prove that he is in actual competition with that favored buyer. In F. Rowe, Price Discrimination Under the Robinson-Patman Act 173 (1962) it is simply stated:

> *Some competitive nexus* between the customers receiving the higher and the

lower prices is a basic predicate of any conclusion of adverse effects at the customer level attributable to a seller's price differentials. (emphasis added)

Wright Patman, one of the original sponsors of the Robinson-Patman Act, has stressed that in order for a "secondary line" violation to be shown,

> There must be evidence to show that the favored and the unfavored competitors are in *actual competition,* or that they would probably be in actual competition if the discrimination were not made. (emphasis added) [W. Patman, Complete Guide to the Robinson-Patman Act, *supra* at 60]

A manager of one of the bills which produced the Robinson-Patman Act, Congressman Utterbach, stated at 80 Cong.Rec. 9416:

> . . . a discrimination is more than a mere difference. Underlying the meaning of the word is the idea that *some relationship exists between the parties to the discrimination which entitles them to equal treatment,* whereby the difference granted to one casts some burden or disadvantage upon the other. If the two are competing in the resale of the goods concerned, that relationship exists. Where, also, the price to one is so low as to involve a sacrifice of some part of the seller's necessary costs and profit as applied to that business, it leaves that deficit inevitably to be made up in higher prices to his other customers; and there, too, a relationship may exist upon which to base the charge of discrimination. But where no such relationship exists, *where the goods are sold in different markets and the conditions affecting those markets set different price levels for them, the sale to different customers at those different prices would not constitute a discrimination* within the meaning of this bill. (italics supplied)

The reason for the competitive nexus requirement is not difficult to fathom. Absent a competitive nexus, a price discrimination in favor of one purchaser could not "substantially . . . lessen competition or tend to create a monopoly", a clear requirement of 15 U.S.C. § 13(a). As stated in *Chicago Sugar Co. v. American Sugar Refining Co.,* 176 F.2d 1, 10 (7th Cir. 1948), *cert. denied,* 338 U.S. 948, 70 S.Ct. 486, 94 L.Ed. 584 (1950):

> But, of course, discrimination by a seller of a commodity cannot lessen competition between customers under the Act unless the discrimination is between customers competing in the distribution of the commodity . . . . That is to say, the parties must be in competition with each other.

■ The "competitive nexus" requirement has at least two elements, functional and geographic. The functional requirement is obvious; customers who buy different products or who are at different stages of the distribution chain (*i. e.,* wholesaler v. retailer) do not directly compete and a favorable price to one does not hurt the other. As the Supreme Court has stated, the focus of Robinson-Patman is on competition "at the same functional level." *Abbott Laboratories v. Portland Retail Druggists Assn., Inc., supra,* 425 U.S. at 12, 96 S.Ct. 1305; *F.T.C. v. Sun Oil Co.,* 371 U.S. 505, 520, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963).

In *M. C. Manufacturing Co., Inc. v. Texas Foundries, Inc.,* 517 F.2d 1059, 1066 (5th Cir. 1975), *cert. denied,* 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976), the Court noted:

> Discriminatory pricing is violative of Robinson-Patman only when it lessens or tends to prevent competition between customers or between sellers. To constitute a Robinson-Patman wrong, the price discrimination must occur between competitors in comparable transactions—i. e., where persons receiving the different prices are in actual, functional competition with one another—and it must have the requisite effect upon actual or potential competition.

There is no doubt in this case that Palmer and ARA compete at the same functional level—both are wholesalers of periodicals and paperback books. But there is also the geographical competition requirement.

Competition due to geographic rather than functional factors is also important in ascertaining the competitive effects of the seller's price differential. For to the extent customers on different sides of a boundary line do not compete with each other, no adverse competitive effects on the customer level can ensue from the supplier's price variations. [F. Rowe, Price Discrimination Under the Robinson-Patman Act, *supra* at 179]

Another treatise indicates:

Less frequently litigated, but also important, is the question whether the favored and disfavored customers are in the same marketing or trade area. Determination of that question is essential to Section 2(a) liability, since, obviously, the requisite adverse competitive effects on the customer level cannot be established unless the various customers actually compete with each other, geographically as well as functionally. [16C J. Von Kalinowsky, Business Organizations: Antitrust Laws and Trade Regulation, *supra* at § 30.02[3], pp. 30–72]

*See also Parrish v. Cox*, 586 F.2d 9, 11 n. 5 (6th Cir. 1978); *Texas Gulf Sulphur Company v. J. R. Simplot Company*, 418 F.2d 793, 805 (9th Cir. 1969); *Ingram v. Phillips Petroleum Company*, 259 F.Supp. 176, 182 (D.N.M.1966).

The competitive nexus requirement of "secondary line" cases, it may be noted, is not applicable to "primary line" cases. *Atlas Building Prod. Co. v. Diamond Block & Gravel Co.*, 269 F.2d 950, 954–955 (10th Cir. 1959), *cert. denied*, 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960).

In plaintiffs' third theory of recovery, as illustrated by the 7-Eleven Store example, it is clear that there is not the requisite geographic competition needed for a "secondary line" claim. No Palmer agency competes directly with the ARA agency in Washington, D.C. which is receiving the favorable price from the national distributors. Plaintiffs attempt to overcome this gap in their cause of action by asserting that they compete with the ARA complex "as a whole" and that the fact that ARA

can use profits garnered in Washington D.C. to finance below-cost competition in the Midwest fulfills the geographical competition requirement.

Unfortunately for plaintiffs, they are unable to produce any authority which convincingly supports their "interstate underwriting" theory. We have examined all of the major cases cited by plaintiffs and find them all easily distinguishable.

*United States v. New York Great A. & P. Tea Co.*, 173 F.2d 79 (7th Cir. 1949). This case involved A&P's utilization of its massive buying power in a number of anticompetitive ways, including (1) the cutting of prices at some stores in order to drive competing stores out of business, while presumably raising prices at other stores to compensate for the reduction of profits, and (2) coercing suppliers into granting discriminatory prices under the guise of fictitious cost savings. Three things should be noted about this case. First, it was a Sherman Act case; no Robinson-Patman violation was alleged. Therefore, any remarks concerning Robinson-Patman were pure dicta. ARA readily admits that it may be guilty of a Sherman Act violation should Palmer be able to prove its 7-Eleven store allegations. What ARA denies is that the distributors are guilty of a § 13(a) violation, and this case does not undermine ARA's position. Second, the reference to the utilization of profits from one store to underwrite below-cost competition at another store was made within the context of a "primary line" situation in light of A&P's relationship with its retailers. Third, the comments contained in the opinion relative to the Robinson-Patman Act are made within a context of direct competition. The opinion simply does not indicate that when A&P used its huge buying power to exact unjustified discounts from suppliers, the elements of functional and geographic competition were missing. [173 F.2d at 88]

*Moore v. Mead's Fine Bread Co.*, 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954). Moore sold bread in one New Mexico market. Mead's sold bread in markets in New Mexico and Texas. Mead's cut its prices in

the New Mexico market in which it competed with Moore, while maintaining its prices elsewhere. The Court of Appeals held that no Robinson-Patman violation appeared because the injury resulting from the price cut in New Mexico "was to a purely local competitor whose business was in no way related to interstate commerce." The Supreme Court reversed, holding that "[t]he profits made in interstate activities [which] would underwrite the losses of local price-cutting campaigns" fulfilled the Robinson-Patman Act's "in commerce" jurisdictional requirement. This case is obviously distinguishable from our case in that (1) it was a "primary line" case, rather than a "secondary line" case, and (2) it concerned only whether the "in commerce" requirement was met, rather than whether a cause of action was stated. It should be remembered, of course, that a "primary line" case does not require the showing of a "competitive nexus" as does a "secondary line" case.

*Littlejohn v. Shell Oil Company*, 456 F.2d 225 (5th Cir. 1972). Plaintiff in this case operated an independent gas station in Dallas. Defendant major oil companies sold gas at a reduced rate to their stations which competed with plaintiff while maintaining regular rates to their stations in other states where plaintiff did not compete. The complaint did not allege that any discriminatory sale had been made across state lines. Following *Moore*, the court held that the "in commerce" requirement could be met by the allegations that defendants' interstate operations were "underwriting" local discriminatory pricing practices. This case is distinguishable in that (1) due to the relationship of the defendants to the gas stations to which they sold, it was a "primary line" case, and (2) the case involved only the question of whether the "in commerce" requirement was met. It should also be noted that this panel decision was later reversed by the Fifth Circuit, sitting *en banc*. In *Littlejohn v. Shell Oil Company*, 483 F.2d 1140, 1142 (5th Cir. 1973), *cert. denied*, 414 U.S. 1116, 94 S.Ct. 849, 38 L.Ed.2d 743 (1973), it was held:

> We disagree with the panel majority that the interstate sale requirement of the Act

may be satisfied by showing the use of profits derived from interstate commerce to underwrite the local price cutting activity.

*Southern Concrete Co. v. United States Steel Corporation*, 394 F.Supp. 362 (N.D.Ga. 1975), *aff'd* 535 F.2d 313 (5th Cir. 1976), *cert. denied*, 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977). In this case, plaintiff, which produced ready-mixed concrete, sued another producer, Williams Brothers, and U.S.S., a supplier of a major ingredient of the concrete. The case is distinguishable primarily because no claim of "interstate underwriting" was even made. Rather, as concerns the Robinson-Patman Act the decision held *only* that *Littlejohn* indicated that a Robinson-Patman plaintiff need not be a purchaser from the defendant. That is simply not the question here. It should also be noted that the allegedly discriminatory prices were apparently granted to Williams Brothers in the same market in which plaintiff competed.

*Reid v. Harper & Brothers*, 235 F.2d 420 (2d Cir.), *cert. denied* 352 U.S. 952, 77 S.Ct. 326, 1 L.Ed.2d 242 (1956). In this case, the appellate court held that the trial court properly left the major issues of the case for the jury's determination in a situation where a book seller in Toledo sued a book publisher alleging that he was in competition with the eight firms which acted as defendant's wholesalers, distributing books throughout the United States. The case contained no "interstate underwriting" claim, and the issue of "competitive nexus" was not even discussed. The Court finds this case to be of little assistance.

*McCormack v. Theo. Hamm Brewing Co.*, 284 F.Supp. 158 (D.Minn.1968). Plaintiff was an independent beer distributor which had the exclusive right to distribute defendant's beer in a given territory in Duluth, Minnesota. Defendant allegedly gave a more favorable price to another independent distributor just across the state line in Superior, Wisconsin. It was argued that plaintiff was not a competitor of the Wisconsin distributor, because both had exclu-

sive territories on opposite sides of the state line. However, the evidence showed that the cities of Duluth and Superior were contiguous and consisted of a single market in which consumers moved freely, crossing state lines. Thus, there was heavy competition at the retail level, and because a distributor's profits depended upon how much beer his retailers could sell, there was held to be actual competition between the distributors, despite the intervening state line and the existence of exclusive areas of dealership. The simple holding of the Court was that as a matter of fact there was actual and direct competition between the two distributors. Because the retailers in Kansas and the retailers in Washington, D.C., do not compete (and such is not even alleged), the *McCormack* case has no relevance to our situation.

*Paceco, Inc. v. Ishikawajima-Harima Heavy Industries Co.*, 468 F.Supp. 256 (N.D. Cal.1979). In this case, plaintiff manufactured cranes in the United States. Defendant Japanese corporations sold cranes in the same market. Defendants purchased the steel for their cranes directly from various Japanese manufacturers. Plaintiff acquired its steel from the same manufacturers as an indirect purchaser from a domestic wholesaler. It was claimed that the steel was sold to defendants at a lower price than it was made available to the United States market. The case did not involve an "interstate underwriting" claim (because the allegedly discriminatory price was granted to a competitor in plaintiff's market), and held only that under certain circumstances a non-purchaser may maintain a Robinson-Patman claim. The *Paceco* decision cited the decisions in *Moore, Littlejohn,* and *Southern Concrete,* but not for any propositions which are especially relevant to the case at hand.

It is important to note that of the cases cited by plaintiffs which involved "interstate underwriting" [*A&P, Moore, and Littlejohn*], all were essentially "primary line" cases. Further, in all the cases, the price discriminations of which complaint was made accrued to the benefit of plaintiff's direct competitors *in the market in which plaintiff did business.*

We are thus unable to conclude that plaintiffs have produced any authority whatsoever which provides clear support for their "interstate underwriting" theory. Plaintiffs do not have the requisite competitive nexus to be allowed to pursue this claim, and have no authority to allow them to fill the void with an "interstate underwriting" claim.

*—Causal Connection.*

As noted above, any Robinson-Patman plaintiff must undertake to prove a causal connection between the price differential complained of and the injury suffered. One author states:

> There must be a causal connection between respondent's price cuts and potential injury to competition. [D. Baum, The Robinson-Patman Act 16 (1964)]

Another author has indicated:

> Of paramount significance in the application of the competitive effects provision of Section 2(a), whether on the supplier or the customer level, is the requirement of a *causal* connection between the challenged price differential and the claim substantial competitive impairment. Unless that causal nexus between the price and the detriment appears, the challenged pricing practice is valid as not *legally responsible* for any asserted competitive impairment which is the "effect of" discrimination in price. [F. Rowe, Price Discrimination Under the Robinson-Patman Act, *supra* at 139]

The Court is unable to find the requisite causal link in plaintiff's 7-Eleven store illustration of its "interstate underwriting" theory of recovery. The only connection of the national distributors to the alleged injury is the fact that they allowed ARA a profit in Washington, D.C. which ARA eventually used in an anticompetitive manner in a geographically distant market. The true cause of the anticompetitive injury was the independent, intervening decision of ARA as to what to do with that profit. Unlike plaintiffs' second theory of recovery, where

the distributors were a party to the agreement to disguise the price concession, the distributors are not alleged to have been a party to the ARA agreement with 7-Eleven.

ARA's independent, intervening decision as to what use to make of its profits gained in one market severs the causal link between the national distributors' activity and the alleged harm to Palmer.

> The intervening independent business judgment of the intermediate distributor, which is beyond the supplier's control, can effectively sever any causal link between the supplier's price differential and competitive effects on the level of the distributor's customers. [F. Rowe, Price Discrimination Under the Robinson-Patman Act, supra at 203]

Imposition of Robinson-Patman liability under circumstances such as this would leave the national distributors with very few options in dealing with a multi-market buyer. Although *Mayer Paving & Asphalt Co. v. General Dynamics Corp.*, 486 F.2d 763 (7th Cir. 1973), *cert. denied*, 414 U.S. 1146, 94 S.Ct. 899, 39 L.Ed.2d 102 (1974) and *Beam v. Monsanto Company, Inc.*, 414 F.Supp. 570 (W.D.Ark.1976) indicate that all a supplier has to do to avoid liability is to treat a multi-market buyer the same as its competitors in each individual market, plaintiffs would impose a much greater burden.

Under plaintiffs' theory, the national distributors might very well have to charge ARA prices which would eliminate the possibility of ARA's obtaining profits in any "distant" market, because *any* such profit would "allow" ARA to underwrite competition against Palmer in the Midwest. That is all that the national distributors are charged with doing in the 7-Eleven example —"allowing" ARA a profit which was used to Palmer's detriment elsewhere. We do not think this alternative is feasible.

Another alternative would be for the national distributors to police the terms and conditions upon which ARA resells periodicals to such retailers as 7-Eleven. However, this would require activity akin to resale price maintenance, a *per se* Sherman Act violation. A similar theory applied in "third line" cases has produced very undesirable results. *See* F. Rowe, Price Discrimination Under the Robinson-Patman Act, *supra* at 173, 186, 196, 201, 204; C. Edwards, The Price Discrimination Law 305–308 (1959); C. Austin, Price Discrimination, *supra* at 51–52; H. Shniderman, Price Discrimination in Perspective, *supra* at 39–42.

The only other option apparently available to the national distributors would be to charge a uniform price nationwide to avoid any claims of favoritism. Again, no authority supports such a view, and it flies in the face of the Supreme Court's suggestion of the use of "carefully drawn submarkets" in *F.T.C. v. Sun Oil, supra*, 371 U.S. at 526–527, 83 S.Ct. 358.

Thus, plaintiffs seek to place the national distributors in a position where to avoid a Robinson-Patman Act violation, they must take action inimical to the Sherman Act. This is obviously an improper course of action, for the Robinson-Patman Act must be construed in a manner compatible with the other antitrust laws. *Pacific Engineering & Production Co. v. Kerr-McGee Corp.*, 551 F.2d 790, 798 (10th Cir.), *cert. denied*, 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977).

None of the cases cited by plaintiff find a causal link between price discrimination and a subsequent injury in a case such as this, where the price discrimination is not somewhere within plaintiff's competitive market—either at the same level as in a "secondary line" case, or somewhere higher up the chain of distribution in a "fourth line" case such as *Perkins v. Standard Oil Co., supra*, 395 U.S. at 642, 89 S.Ct. 1871.

In summary, we find the causal link between the prices charged by the distributors in Washington, D.C. to ARA and the subsequent alleged injury to Palmer in the Midwest resulting from an agreement in which the distributors played no part, to be too tenuous to support a Robinson-Patman claim. Because plaintiffs are unable to meet either the "competitive nexus" requirement or the "causal connection" re-

quirement, we reject this illustration of the "interstate underwriting" theory as a possible basis for Robinson-Patman liability.

## COUNT VII

*The Complaint*

■ Count VII, to which the remainder of the distributor defendants' motion for partial judgment on the pleadings is addressed, was filed in July, 1978, two and one-half years after this action was filed. It pertains to the so-called "Molasky takeover". ¶ 95 realleges ¶¶ 1–49, and 53–55 of the amended complaint. These paragraphs encompass the general allegations of the complaint, plus Counts I and II, which allege violations of Sections 1 and 2 of the Sherman Act.

¶ 96 alleges that subsequent to the filing of the action, ARA and the national distributors agreed, combined and conspired to further restrain competition and effectuate their monopolization or attempt to monopolize the Kansas City market, among others. It is claimed that the defendants engaged in contracts, combinations and conspiracies in restraint of trade, and have attempted to monopolize and have monopolized interstate commerce in the Kansas City area, all in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. It is further claimed that defendants have effectuated the takeover by ARA of certain former wholesalers known as the "Molasky" agencies in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

¶ 97 alleges the specific acts composing the allegedly wrongful scheme:

(a) With the intent to preclude competitors from obtaining customers in the Kansas City area, ARA, with the continued assistance of the national distributors, engaged in predatory acts and practices in the solicitation of customers;

(b) In late 1976 and early 1977, ARA and the defendant distributors agreed, conspired and combined to effectuate the takeover of the business of K.C. News Distributors, Inc., a "Molasky agency";

(c) Certain distributors agreed, combined and conspired to designate ARA as the succeeding wholesaler in the Kansas City area;

(d) The other defendant distributors also named ARA as the succeeding wholesaler;

(e) Certain distributor defendants and ARA advised prospective customers that ARA was the "successor" wholesaler;

(f) The defendant distributors agreed to timely furnish publications to ARA, but refused to deal with plaintiffs under the same terms and conditions;

(g) ARA made lump sum payments to defendant distributor Curtis in the sum of $2.5 million, remitted from various ARA agencies;

(h) ARA, with the knowing assistance of the other defendants, acquired the assets and substantially all of the business of the Molasky agencies in the Kansas City area, the St. Louis area, and the New Orleans area.

¶ 98 alleges that by reason of the foregoing there has been further unreasonable restraint of competition and trade in the Kansas City area, and elsewhere, and defendants have monopolized and threatened to further monopolize such trade in the Kansas City area and in other areas where plaintiffs have done business and seek to do business.

¶ 99 claims undetermined damages in a sum in excess of $10,000.

¶ 100 requests injunctive relief.

*The Statute*

§ 7 of the Clayton Act, 15 U.S.C. § 18, reads, in pertinent part, as follows:

No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

## Discussion

The pending motion for partial summary judgment by the national distributor defendants aims only at the Clayton § 7 claims of Count VII. In those claims, plaintiffs challenge the legality of ARA's takeover of the "Molasky agencies" in Kansas City and elsewhere. ARA's acquisition of the assets of K.C. News Distributors, Inc. is the type of activity which Clayton § 7 seeks to prohibit when it states that "no corporation . . . shall acquire the whole or any part of the assets of another corporation" under certain circumstances. The national distributor defendants move for partial summary judgment on the basis of the simple argument that they obtained no part of the Molasky agencies' stock or assets, and therefore did not violate 15 U.S.C. § 18.

In response to the motion, plaintiffs make two arguments. First, plaintiffs argue that case law permits recovery against parties who merely aided an illegal acquisition or merger, even though those parties did not acquire anything themselves. The cases cited by plaintiffs include *United States v. Coca-Cola Bottling Company of Los Angeles*, 575 F.2d 222 (9th Cir. 1978), *cert. denied*, 439 U.S. 959, 99 S.Ct. 362, 58 L.Ed.2d 351; *United States v. Phillips Petroleum Co.*, 367 F.Supp. 1226 (C.D.Cal.1973), *aff'd* 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1979); *United States v. Reed Roller Bit Co.*, 274 F.Supp. 573 (W.D.Okl.1967); and *United States v. E. I. duPont de Nemours and Company*, 177 F.Supp. 1 (N.D.Ill.1959). We have examined these cases and find that they merely stand for the proposition that a court can maintain as a Clayton § 7 defendant any party whose presence is necessary to effectuate relief. For example, in *United States v. E. I. duPont de Nemours and Company, supra*, 177 F.Supp. at 11, the court stated it was of the opinion that

. . . in a proceeding under Section 7 of the Clayton Act in which it has been found that the acquisition of stock by one corporation in another violates the statute, a court of equity has power to grant such relief against the corporation whose stock has been acquired *as may be neces-*

*sary and appropriate* in the public interest to eliminate the effects of the acquisition which have been held to be offensive to the statute. (emphasis added)

Naturally, when an acquisition is made in violation of Clayton § 7, it may be necessary to include the seller in the formulation of relief, even though only the *acquisition* is a violation of 15 U.S.C. § 18. Thus, it is noted in the *Coca-Cola* case that although the seller does not violate the statute, it may be maintained as a defendant for purposes of effectuating relief:

By its express terms § 7 proscribes only the act of acquiring, not selling, when the forbidden effects may occur. Aqua Media is correct in its initial assertion that technically it has not violated the Clayton Act. *See Dailey v. Quality School Plan*, 380 F.2d 484 (5th Cir. 1967); *U. S. v. Parker-Hannifin Corp.*, 1974 Trade Cases ¶ 75,061 (C.D.Cal.1974); *Record Club of America, Inc. v. Capitol Records, Inc.*, 1971 Trade Cases ¶ 73,694 (S.D.N.Y.1971); *In the Matter of Dean Foods, et al.*, 70 F.T.C. 1146 (1966). Nevertheless, the fact that sellers are not violators of § 7 does not force courts to close their eyes to the fact that the sellers are parties to an acquisition which is prohibited by law. Congress recognized that on occasion third parties whose conduct is not specifically addressed by the Clayton Act would be so related to the anti-competitive effects at which the act was directed that their presence would be necessary in order to fashion complete relief. [575 F.2d at 227–228]

Thus, the *Coca-Cola* case upon which plaintiffs rely clearly points out that a non-acquiring party does not violate § 7 of the Clayton Act. Plaintiffs admit that "selling" to a Clayton § 7 violator may not be a violation, but maintain that they charge the distributors with conspiring to aid the "acquisition." The distinction is specious. No party more directly aids an illegal acquisition than the seller. If the seller does not violate Clayton § 7, neither have the national distributors in light of the allegations made in plaintiffs' complaint.

Nor is the presence of the national distributors *necessary* to the effectuation of relief, as would be the presence of sellers as in the cases cited by plaintiffs. Plaintiffs have cited no cases indicating that the presence of a non-party to the transaction would be necessary to effectuate relief.

Plaintiffs' reliance upon *Bay Guardian Co. v. Chronicle Publishing Co.*, 340 F.Supp. 76 (N.D.Cal.1972) is unpersuasive in light of that decision's failure to discuss this issue.

Plaintiffs' second argument is that an antitrust action is tortious in nature, and the distributors should remain as defendants because they are joint tortfeasors in light of the assistance which they allegedly gave to ARA in the "Molasky takeover." Plaintiffs cite no authority in support of that position in a Clayton § 7 case. The quotation above from the *Coca-Cola* case would impliedly reject the argument. We find it unpersuasive.

We conclude that plaintiffs' Clayton § 7 claims against the national distributors should be dismissed.

## CONCLUSION

IT IS THEREFORE ORDERED that the national distributors' motion for partial summary judgment (Doc. # 694) is sustained as to the Clayton § 7 portion of Count VII, and is otherwise denied.

IT IS FURTHER ORDERED that ARA's motion for partial judgment on the pleadings (Doc. # 715) is denied.

IT IS SO ORDERED.